Frances M. BONEBRAKE, Administratrix De Bonis Non of the Estate of Woodrow B. Simek, Deceased, Plaintiff-Appellee,

v.

Donald COX and Claude Cox, d/b/a Tamarack Bowl, Defendants-Appellants.

No. 73–1730.

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1974.

Decided July 2, 1974.

Dennis M. Gray, Council Bluffs, Iowa, for defendants-appellants.

Robert J. Laubenthal, Council Bluffs, Iowa, for plaintiff-appellee.

Before HEANEY and STEPHENSON, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This is an appeal from a judgment of $27,000 entered by the District Court on the recommendation of a Special Master in favor of the plaintiff, Frances M. Bonebrake, administratrix of the estate of Woodrow B. Simek (the seller), against the defendants, Donald and Claude Cox, d/b/a Tamarack Bowl (the buyers).

Plaintiff's decedent had entered into two contracts with the Cox brothers for the sale and installation in defendants' bowling alley of bowling equipment. The dispute arose when Simek died. At that time the delivery and installation were incomplete and less than half of the purchase price paid. The defendants obtained equipment elsewhere and hired others to finish the installation. Plaintiff's suit to recover the balance of the contract price was met by defendants' counterclaims for damages suffered. The Special Master rejected defendants' counterclaims and their defense that Simek or his estate had breached the contracts first, and awarded plaintiff the balance due on the contracts ($28,000) less the value to the seller of unaccepted goods ($1,000).

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

The harshness of the result is conceded by the Special Master,[1] but he felt himself constrained to such result by the provisions of the Uniform Commercial Code (the "Code").[2] It is indeed harsh that the defendants be required to pay the full contract price for the goods, and be denied *in toto* their counterclaim for damages arising from their grossly defective condition. We are satisfied that the Code mandates no such result and that it has been misconstrued. Moreover, we are of the opinion with respect to an implied holding on a combined question of fact and law (anticipatory breach by Simek's estate) that although there is some evidence to support the ruling, on the entire record we are "left with the definite and firm conviction that a mistake has been committed" and thus we are confronted with clear error.[3] We reverse and remand.

In view of the fact that the application of the Code to the facts presented is essential to the resolution of the controlling issues on appeal we will describe the transaction before us in some detail.

The Cox brothers had for some 20 years run a bowling alley called the Tamarack Bowl in Missouri Valley, Iowa when, on February 5, 1968 it was gutted by fire. They determined to rebuild, and on April 17, 1968 entered into a written contract with Simek for the purchase of:

the following used equipment hereinafter set forth, installed in the Tamarack Bowl, on the ground floor, in Missouri Valley, Iowa.

10 Lane beds complete with one piece gutter, tail planks, kickbacks, etc.

5 Magic circle underlane ball returns

10 Score chairs

Fibre glass seating (for 10 lanes)

1 Streamline bubble ball cleaning machine

50 Lockers—5 Radarays

63 Assorted house balls

3 Ball storage racks

50 Pair rental shoes

Foundation material

For the total price of $20,000.00.

\* \* \* \* \* \*

[Simek] will start construction work on or about May 15th, 1968 and further agrees to re-surface the lanes, and apply finish coats.

Simek's principal place of business was in Ashland, Nebraska. He was the sole proprietor of a bowling alley and dealt in new and used bowling equipment. He owned storage facilities in Ashland, Mead and Greenwood, Nebraska. Simek hired one Ilert Avery, commonly known as "Blackie", to install all the listed items except the balls and shoes. The first and principal job was to put the lanes in, but this was not begun until August, 1968, because the building had not yet been completed.

On August 23, 1968 the Cox brothers further contracted with Simek to purchase, for $35,000.00,

10 used Brunswick Model A pinspotters delivered and installed in the Tamarack Bowl, with motors and gear boxes carrying a one year guarantee.

No date was specified for the completion of either contract although it is clear that the Cox brothers were under con-

---

1. "The Special Master is not insensitive to the strong evidence that the pinspotters were seriously defective when they were accepted by the defendants. It may appear harsh that the defendants must now pay the full balance of the contract price for these goods, but the Court cannot rewrite the law."

2. In a conclusion which neither party challenges, the Master found that the law of Iowa governs the resolution of this dispute. The Iowa Uniform Commercial Code is found in the Code of Iowa §§ 554.1101–554.-10105 (1971). For convenience we will refer to its provisions simply by section number, e. g., § 554.2607(3)(a). The number following the decimal point in the Code of Iowa corresponds (less the hyphen) to the number used by the American Law Institute; in the above example, § 2–607(3)(a). Any reference to a hyphenated section number or to a Comment is to the Uniform Commercial Code (1962 version).

3. Gross v. Fidelity & Deposit Co., 302 F.2d 338 (8th Cir. 1962).

siderable time pressure to have the deliveries and work under the contracts completed. Their sources of steady revenue were the local bowling leagues which, after the fire, had taken their business elsewhere. These leagues were organized under the rules of the American Bowling Congress and the Women's International Bowling Congress which call for the playing of four "rounds" of bowling over a thirty-six week schedule. Traditionally, league play at the Tamarack Bowl and other alleys begins in late August or early September in order to be completed before the summer months. The "volunteers" who are mentioned below were local league members who were anxious to see that the Bowl open in time for the fall season.

Simek hired Blackie to unload the machines and set them in place at the end of the lanes. On September 4 this work was complete, but, the Special Master found, the pinspotters had not been "installed" within the meaning of the contract. They were "not only inoperative, but [were] in a very poor condition." Donald Cox testified that when he first saw the machines at the end of the lanes "they were kind of a mess. * * * On every machine pretty near every bearing was froze or had to have some attention or a lot of replacement parts. Lots of them." With the help of volunteers and advice from Blackie repair work was immediately begun; the machines were dismantled and parts cleaned or replaced. Blackie was clearly aware of the Cox brothers' dissatisfaction with the machines, but Simek died September 6 before they could communicate directly with him. Twenty thousand dollars had been paid on the pinspotter contract.

With respect to the first contract, the Master found the following goods to be undelivered as of September 6:

1.  10 Score chairs

2.  Fiberglass seating for 10 lanes

3.  Streamline Bubble Ball Cleaning Machine

4.  50 Lockers

5.  63 Assorted house balls

6.  3 Ball storage racks

7.  50 Pair of rental shoes

The lane beds had been installed, and the ball returns and "radarays" called for in the contract were delivered but not installed. Seven thousand dollars had been paid on this contract. With the help of Blackie, the Cox brothers immediately attempted to locate, and identify to the contract, the undelivered goods. These efforts will be discussed in more detail under our consideration of the buyers' claim of anticipatory breach.

Meanwhile, the effort to repair the concededly defective pinspotters continued. About September 12 an altercation developed with Blackie who left the job. A number of bowling equipment specialists were immediately called in to complete the repair work and to finish the installation of the ball returns and the "radarays".[4] The defendants contacted a lawyer who drafted the following letter to plaintiff:[5]

September 17, 1968

Mrs. Frances Bonebrake
Ashland, Nebraska

Dear Madam:

We represent Claude and Donald Cox, owners of the Tamarack Bowl in Missouri Valley who entered into a contract with your brother, Woodrow Simek for the purchase and installation of ten alleys complete and ten automatic pinsetters installed and complete.

At the time of Mr. Simek's death he was engaged in the installation of said items and had the installation over half completed. Following his death

4.  These latter items were promised under the first contract. Blackie testified that at the time he quit he could have completed his work on the first contract in eighty man hours, or five days, using two men.

5.  Mrs. Bonebrake testified that she never received the letter. The Master found, however, "no reason to believe that [it] was not mailed."

the employees which were assisting in the installation left the job, and it was necessary for the Cox brothers to look elsewhere for the additional parts and supplies which had not been delivered, and to commence work on completing the installation of the alleys and pinsetters with such other help as they were able to obtain.

They are gradually locating and obtaining the necessary parts for repairing the pinsetters and are getting them installed, although this is going to result in a considerable delay beyond the date of completion, and which will, of course delay the commencing of the bowling season. It may result in requiring them to have shorter league seasons which will result in a substantial loss of income.

Mr. Donald Cox has recently talked with you about this and he told us that an Administrator has or will be appointed for his estate in Ashland, Nebraska.

The Cox brothers had paid Mr. Simek $27,500.00 at the time of his death on a total contract price of $55,000.00 covering the cost of the alleys and pinsetting equipment and the installation which included a guarantee as to the quality and performance of the equipment.

They hope to be able to complete the installation at a cost not greater than the contract price, but they will nevertheless no doubt sustain substantial loss caused by the delay and lateness in starting the bowling season.

The Cox brothers are greatly concerned about this, and among other things they are concerned about whether or not all of the equipment which has been delivered and partially installed had been paid for by Mr. Simek prior to his death.

Our clients are keeping an accurate record of all payments which have been made by them, or which are now being made by them in paying the cost of completing the installation, so that they can substantiate a claim for any loss which may be sustained. We wish to be advised as to what action has been taken concerning the probate of the estate of Mr. Simek, and the name of the attorney who will be taking care of this matter for you, and we would suggest that this letter be handed such attorney so that he will be aware of the position of our clients.

> Very truly yours,
> ACREA & PEARSON
> K. C. Acrea

KCA/mas

Work proceeded on the job under the direction of the Cox brothers, the Bowl finally opening for business on October 14th. Subsequent to this date, the leagues could complete only three of the usual four rounds of play.

In the interpretation of the Code we are here called upon to construe, we are guided by its stated purposes and its self-contained rules of construction. We find in § 554.1102 that it is to be "liberally construed and applied to promote its underlying purposes and policies," which are, among others, "to simplify, clarify and modernize the law governing commercial transactions." The intent here was "simply that the law of commercial transactions be, so far as reasonable, liberal and nontechnical" and, to that end, that the Code "liberalize ('de-technicalize') important branches of commercial law."[6]

These canons of construction we find violated in the case before us in three major aspects: 1) the ruling that the Code's requirements of notification were violated with respect to the defective pinspotting machines, thus causing the "harsh result" above described; 2) the ruling that the April contract did not fall under the Code because it was a "mixed" (goods and services) contract, and 3) the implied ruling that there was

---

6. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code 14–15 (1972) [hereinafter cited as White & Summers].

no anticipatory breach of the contracts by the seller during the time period immediately subsequent to the seller's death. We will consider these seriatim.

I

With respect to the pinspotter contract the Master found that "[t]he term 'installed' in the [contract] required that the used equipment be placed in operational condition and amounted to a warranty for fitness under the U.C.C. * * * The pinspotting machines received by the Cox brothers before September 6, 1968 were defective and did not meet [this] warranty standard." He held, however, that when the Cox brothers accepted the goods they were left with this alternative:

In order for them to maintain a cause of action for breach of warranty, it must be found that defendants notified Simek or his administrators of such non-conformities within a reasonable time (§ 554.2607(3)(a) and § 554.2605(1)(a)) and that, if the time for performance had not expired, they did not by their actions or failure to notify reasonably put it beyond plaintiff's power to cure the defective performance * * *.

The Master found neither condition met:

The letter of September 17, 1968 * * * and the oral communications between the Cox brothers and Mrs. Bonebrake immediately following Simek's death, failed to constitute notice of non-conformity * * *.

An offer by Simek's administrators to complete the contract and to cure the defective machinery was made within the reasonable time for performance set by the contract and was wrongfully and unjustifiably rejected by the Cox brothers.

Consequently, he concluded that "the defendants waived their rights to warranty recovery."

7. This option is clearly open to the buyer under the Code. §§ 554.2607(2), 554.2601 and Comments thereto. *See also* Dailey v.

■ We agree with the defendant-buyers that the Master has confused the notice requirements of § 554.2607(3)(a) and § 554.2605(1). Section 554.-2607(3)(a) deals with the situation where, as in the case at bar, the buyer accepts nonconforming goods and sues for breach.[7] It provides:

Where a tender has been accepted * * * the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *.

Section 554.2605(1) deals with the situation where the buyer elects to reject nonconforming goods. It provides:

The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on the unstated defect to justify rejection or to establish breach

*a.* where the seller could have cured it if stated seasonally; or

*b.* between merchants when the seller has after rejection made a request in writing for a full and final written statement of all defects on which the buyer proposes to rely.

Comment 4 to § 2–607 makes clear the difference between the notice requirements of the two sections:

The content of the notification [under § 2–607(3)] need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. *There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605).* Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other re-

Holiday Distrib. Corp., 260 Iowa 859, 872, 151 N.W.2d 477, 486 (1967) (pre-Code).

sort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation. [emphasis supplied.]

We find no merit to plaintiff's contention that "the Special Master, in his opinion, never stated that the notice the appellant-seller [sic] must give where the buyer accepts the goods must specify the particular defect."[8] We hold that, measured by the proper standard, the letter of September 17 was sufficient under § 554.2607 to "notify the seller of breach" of the pinspotter contract. It explicitly states that the pinspotters were not installed within the meaning of the contract, that the pinspotters needed repairs although the contract "included a guarantee as to the quality and performance of the equipment," and that the Cox brothers were keeping a record of their expenses "so that they can substantiate a claim for any loss which may be sustained." This notice is more than adequate to "let the seller know that the transaction is still troublesome." Lewis v. Mobil Oil Corp., 438 F.2d 500, 509 (8th Cir. 1971); Boeing Airplane Co. v. O'Malley, 329 F.2d 585, 593–596 (8th Cir. 1964).

■■ Further, the Master erred in concluding that the Cox brothers "waived their rights to warranty recovery" by refusing to permit the seller to cure the defects in the pinspotters. The seller's right to cure, as provided in § 554.2508, is in terms limited to the situation where nonconforming goods have been rejected by the buyer.[9] Here, the defective pinspotters had been accepted and the buyer is attempting to recover damages. Again the Master imposed, as a precondition to any remedy at all, those requirements which condition only the most drastic of buyer's remedies, rejection. While it may be true that the "most important reason for requiring notice [under § 2–607] is to enable the seller to make adjustments or replacements or to suggest opportunities for cure to the end of minimizing the buyer's loss and reducing the seller's own liability to the buyer,"[10] a buyer who has accepted nonconforming goods is under no duty to accept an offer of cure by the seller. His refusal to do so raises only the question of whether he has properly mitigated his damages; it does not extinguish entirely his right to recover.

## II

■ We now consider whether the contract of April 17, 1968 comes under the Code. Its background we have noted. The fire suffered by defendant's bowling alley on February 5, 1968 had destroyed its equipment. This contract with Simek was to replace those goods. The "following used equipment" was purchased: lane beds, ball returns,

---

8. If the above quoted passages of the Master's opinion are not conclusive on the point, we note, as well, the following:

[T]he defendants had at least two options when the defective pinspotters were tendered:

1) they could justifiably reject the goods and demand either their money back or proper goods, or,

2) they could accept the goods and *notify the plaintiff of the particular defects*, thereby giving the plaintiff time to cure the defects and preserving their rights. [emphasis supplied.]

9. § 554.2508 provides:
*Cure by seller of improper tender or delivery—replacement.*

1. Where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

2. Where the buyer rejects a nonconforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

10. White & Summers 344.

chairs, bubble ball cleaning machine, lockers, house balls, storage racks, shoes, and foundation materials. The equipment was to be delivered and installed by Simek. He warranted that the lanes would be "free from defects in workmanship and materials," and that they would "meet all ABC specifications." The purchase price was stated to be "for the total price of $20,000.00," two thousand dollars payable upon the execution of the contract, another payment "when work begins laying sub-floor, or foundation material; and the balance upon completion of this installation."

The language thus employed is that peculiar to goods, not services. It speaks of "equipment," and of lanes free from "defects in workmanship and materials." The rendition of services does not comport with such terminology.

The Master, however, ruled that the above-described contract "is not the type of contract which falls within the statutory scheme of the U.C.C. It involved substantial amounts of labor, as well as goods, with a lump sum price. The Code was meant to cover contracts for the commercial sale of goods, not non-divisible mixed contracts of this type."

In such holding there is error. Article 2 of the Code, here involved, applies to "transactions in goods." § 554.2102. The definition of "goods" is found in § 554.2105(1):

"Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 554.2107).

As Nordstrom [11] points out, this section is divided into two parts, the first affirmative, defining the scope and reach of Article 2, the second negative, excluding certain transactions. To come within the affirmative section, the articles (the "things") must be movable, and the movability must occur at the time of identification to the contract. The applicability of the Code to the April contract is clear from and within its four corners. The "things" sold are all items of tangible property, normally in the flow of commerce, portable at the time of the contract.[12] They are not the less "goods" within the definition of the act because service may play a role in their ultimate use. The Code contains no such exception. "Services," continues Nordstrom, id. at 47, "always play an important role in the use of goods, whether it is the service of transforming the raw materials into some usable product or the service of distributing

11. R. Nordstrom, Handbook of the Law of Sales 40, 44 (1970) [hereinafter cited as Nordstrom].

12. Seller argues that this was a "construction contract" such as that held to be outside Code coverage in Vernali v. Centrella, 28 Conn.Sup. 476, 266 A.2d 200 (Super.Ct. 1970) (contract for the construction of a house according to specifications). The analogy urged is that it involved "the attaching of moveable objects so that at their [sic] completion of the contract they are immoveable." We reject this contention for two reasons. First, the time for testing whether a thing is movable for purposes of § 554.2105 is "the time of identification to the contract," which here occurred before the installation of the equipment. § 554.2501(1)(b). Second (and alternately) it is not clear that, as

the seller argues "the lanes are built into the building." They were not constructed on the site, but, Blackie testified, came in three prefabricated sections:

[Y]ou move your lane in, stand them on edge; and they're in three pieces in most cases.
You splice them together * * *. Then you lay these lanes down, line them up, level them, as you screw them to the wood foundation * * *.

The "wood foundation" is not part of the building but was constructed on the "concrete floor that's there when we move in the building." In addition to this evidence we note this was a contract for "used" lane beds; their previous installation in some other bowling alley had not rendered them immovable.

the usable product to a point where it can easily be obtained by the consumer. The § 554.2105(1) definition should not be used to deny Code application simply because an added service is required to inject or apply the product." In short, the fact that the contract "involved substantial amounts of labor" does not remove it from inclusion under the Code on the ground, as the special Master found that "The Code was [not] meant to cover * * * non-divisible mixed contracts of this type."

Thus Aluminum Company of America v. Electro Flo Corp., 451 F.2d 1115 (10th Cir. 1971) involved an "electrified floor and Whirly Dodge vehicles operating on it" for use by carnival companies. Defendant Electro Flo was incorporated for the purpose of making commercial use of this idea. Plaintiff (Alcoa) undertook to design and produce the flooring materials. In an action on the contract, with Electro Flo arguing breach of implied warranty, Alcoa defended in part upon the theory that it was a contract for services rather than sale. The Court, however, found that "the transaction between Alcoa and Electro Flo, while it involved some engineering and design aspects, was in essence a sale of goods." 451 F.2d 1118. It held, in part:

> While it is true that Alcoa utilized design engineers on the project, these services were for the purpose of enabling Alcoa to fulfill Electro Flo's requirements for goods. Electro Flo did not order or contract for engineering. Alcoa's full charge was for materials furnished; its offer was by price quotation for the products only, and it did not bill for engineering services or seek compensation therefor save as the cost of such services entered into the price for the materials delivered.

*Id.*

We find a similar holding in Port City Construction Co., v. Henderson, 48 Ala.App. 639, 266 So.2d 896 (1972) involving a contract for the sale of concrete and "all labor to pour and finish,"

both at a stated price. On the interpretation of the contract the court held as follows:

> In the beginning of our discussion, we first observe that the contract or agreement upon which suit was brought is in essence a contract for sale, though including an agreement for work and labor, as defined by * * * Section 2–106 of the Code. Thus it is subject to be considered and to be controlled by the applicable provisions of the Uniform Commercial Code as adopted in this State.

To the same effect is Warner Motors, Inc. v. Chrysler Motors Corp., 5 UCC Rep. 365 (U.S.D.Ct.E.D.Pa.1968), litigation involving breach of a dealer's agreement. The court held in part as follows:

> It seems to me that there can hardly be any question that the dealer agreement is a "contract for sale" within the meaning of § 2–725 of the Uniform Commercial Code. The business of the Chrysler Corporations was selling the automobiles, which Chrysler manufactured and the declared "purpose of the relationship established" by the agreement was "to provide a means for the sale and service of DeSoto and Plymouth passenger cars, parts and accessories." Certainly, the fact that the agreement contained terms providing for services, franchising and the like in no way affects its character as determined by its overall object, namely selling automobiles. See Weilersbacher v. Pittsburgh Brewing Co., 421 Pa. 118 [3 UCC Rep. 309] (1966), in which case the Supreme Court of Pennsylvania held article 2 of the code to be applicable to a similar agreement between a brewery and a beer distributing agency.

In contrast to the language of the April contract before us, in which "the following used equipment" was purchased, we note the contractual terminology employed in Computer Servicenters, Inc. v. Beacon Mfg. Co., 328 F.Supp. 653

(D.S.C.1970), aff'd, 443 F.2d 906 (4th Cir. 1971), wherein the court, in holding that the contract there before it was one for service, rather than for the sale of goods, held as follows:

Article 2 of the Commercial Code deals with "transactions in goods." [§ 2–102]. "Goods" as used in the section means "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action." [§ 2–105(1)]. That definition is indeed broad, however, it must be noted that the article deals with, and the definition of goods is cast in terms of, the contract for sale. "Sale" "consists in the passing of title from the seller to the buyer for a price." [§ 2–106(1)].

The fact of the matter here is that the alleged contract was simply not for the sale of goods as contended by the plaintiff. Rather it was that certain services be provided the defendant by the plaintiff. The written proposal states that it is an agreement "for performance of data processing services." The proposal indicated that there would be a separate charge for supplies unless the defendant provided them. The payment contemplated was for the analysis, collection, storage, and reporting of certain data supplied the plaintiff by the defendant. It was not for the sale of goods, and to claim to the contrary strains the imagination.

328 F.Supp. at 654–655.

The parties have cited to us as authority for categorization as sales or service contracts certain "blood" cases and cosmetics cases.[13] Although such cases utilize analyses similar to that here employed we will not discuss them further in view of their widely variant factual and policy consideration.[14]

Finally, on this phase of the case, we find a dearth of authority going to a point relied upon by the Special Master, namely, that the Code was not meant to cover "non-divisible mixed [goods and services] contracts of this type." Rather, the cases presenting mixed contracts of this type are legion. The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e. g., contract with artist for painting [15]) or is a transaction of sale, with labor incidentally involved (e. g., installation of a water heater in a bathroom [16]). The contract before us, construed in accordance with the applicable standards of the Code, is not excluded therefrom because it is "mixed," and, moreover, is clearly for the replacement of equipment destroyed by fire, i. e. "goods" as defined by the Code.

### III

The buyers argue that there was an anticipatory repudiation of the April contract subsequent to the seller's death. The Special Master did not rule directly on the issue thus presented, although it is clear that he rejected it since he found that the buyers themselves had repudiated the contract by taking over the repair and installation of the goods subsequent to the seller's death, and by refusing further delivery or service (ap-

---

13. Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954); Epstein v. Giannattasio, 25 Conn.Sup. 110, 197 A.2d 342 (C.P.1963).

14. See Comment, Sale of Goods in Service-Predominated Transactions, 37 Fordam L. Rev..115 (1968); Comment, Blood Transfusions and the Warranty Provisions of the Uniform Commercial Code, 9 B.C.Ind. &

Com.L.Rev. 943 (1968); Nordstrom 46–47, and cases therein cited.

15. National Historic Shrines Foundation, Inc. v. Dali, 4 UCC Rep. 71 (N.Y.Sup.Ct.1967).

16. Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971) (" * * * we deem this case to involve 'goods' within the purview of the Uniform Commercial Code.")

parently by the Administrators) under the contract.

The situation at the time of the seller's death warrants close examination from the standpoint of business feasibility. The seller had neither business associates nor partners. It was a one-man operation. Upon hearing of Simek's illness, which ultimately resulted in his death, Donald Cox went immediately to see him. Most of the goods called for in the April contract had not been delivered; others had not been installed, and the pinspotting machines were seriously defective. The reason for his trip, despite the illness, was that "we didn't have any business yet or no way to get it opened." He was too late. The seller died on Friday, September 6. On Saturday, September 7, Blackie suggested that they go to a Simek warehouse at Mead for equipment, but the trip was fruitless. There were only a few mismatched lockers and some hardware. Calls were made to Simek's suppliers in an unsuccessful effort to locate the missing equipment. On Monday, September 8 they went to Ashland to talk with the seller's sister, Mrs. Bonebrake. "We were * * * in a real bind," they told her. "[T]he job was just incomplete. We didn't know which way to turn." She (and we do not speak critically) was of no help whatever. She said she knew nothing of her brother's business, but she did take them to a building where they obtained a number of balls and shoes. On Wednesday, September 11 they called on her again "because we obviously weren't getting anywhere." Mrs. Bonebrake remembers only one visit, but whether or not she spoke with them once or twice is not significant. The record is clear that she was unable to help them or to suggest productive action at any time during their contacts. Up to this point the buyers were clearly trying to act within the contract. Their conferences with the seller's sister and with Blackie are capable of no other construction. But fol-

lowing the last visit, upon their return to Missouri Valley, they "got [their] heads together that night as far as what we were going to do and the next day we acted." The action taken was to proceed on their own, without further reference to Mrs. Bonebrake or Blackie, with their efforts to get their business into operation. The missing equipment was ordered from others.

The buyers assert that their action was justified because at this point they were confronted with a repudiation of their contract, anticipatory in that the time for performance was still open, but nonetheless a breach. We are of the opinion that the requirements of "anticipatory repudiation" [17] under the Act were clearly present. The statutory requirement for anticipatory repudiation is not that performance be literally or utterly impossible. The Code was framed with the day to day requirements and customs of businessmen in mind, not the legalisms of counsel. The Code does not require the certainty of the physicist or the utter frustration of literal impossibility. What is required under the Code, to permit the aggrieved party to move for his own protection, is "action which reasonably indicates a rejection of the continuing obligation." [18] Viewed in the light of the situation confronting the buyers at the time, the fact that they could not find suitable goods in the seller's warehouses, that there was no one to whom they could turn, the crucial time element involved if the enterprise were to qualify for league competition, and the deplorable state of the equipment furnished, there was, beyond doubt, a reasonable indication of a rejection of the continuing obligation (due to the circumstances involved, we note, rather than malevolence or ill will), and thus an anticipatory breach under the Code. We do not explore the situation after the arrival of the Administrators on September 17. These gentlemen, one a rural mail carrier, the other an insurance and real es-

---

17.  § 554.2610.

18.  § 2–610, Comment 2.

tate agent, were each without relevant experience and were equally in the dark as to what to do. "[W]e didn't know what there was to do or anything; we had no idea," testified the carrier. Should their offer to proceed under the contract be argued as a retraction of the anticipatory repudiation,[19] it came too late. The buyers by this time had "materially changed" their positions.[20]

The judgment of the District Court is reversed and the cause is remanded for further proceedings consistent herewith.