147 N.J. Super. 77 (1977)
370 A.2d 547
CYRIL MEYERS, T/A OVERHEAD DOOR COMPANY OF METUCHEN, PLAINTIFF,
v.
HENDERSON CONSTRUCTION CO., DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided January 27, 1977.
Mr. George Perselay for plaintiff (Messrs. Hooley, Perselay, Butler & Kelly, attorneys; George Perselay on the brief).
Mr. Daniel F. O'Connell for defendant (Messrs. Lanigan and O'Connell, attorneys; Daniel F. O'Connell on the brief).
WEISS, J.D.C., Temporarily Assigned.
This case comes before the court on defendant's motion for summary judgment. The issue to be resolved is whether the plaintiff's action on a contract is barred by the four-year limitation period *78 of N.J.S.A. 12A:2-725 or whether the six year limitation period of N.J.S.A. 2A:14-1 is applicable.
The relevant facts viewed in a light most favorable to plaintiff are as follows: In October 1968 Crawford Door Sales entered into a contract with Henderson Construction Co. (Henderson), to supply and install overhead doors at the Sterling Extruder job site. The agreed upon price was $3,850 and was not itemized. In November 1969 Overhead Door Co. of Metuchen (Metuchen), purchased the business, including the contract in question, from Crawford Door Sales. The contract set forth the obligation of Metuchen as follows:
Furnish all labor, materials, tools and equipment to satisfactorily complete the installation of all overhead doors as required by revised plans and specifications, including addenda 1 and 2, as prepared by Collins. Uhl and Horsington, Architects and Engineers. Lump sum price for work includes N.J. Sales Tax  $3,850.00 Submit six copies of shop drawings and/or details to this office, for architect's approval, immediately.
Metuchen purchased the disassembled overhead door unit directly from the manufacturer. The drawings and plans, describing the doors in detail, show them to be not unlike the overhead doors often installed in factories throughout the area. Each of the four doors is 11'10" wide and 14'1" high and is raised and lowered on a track system. The unit was delivered to plaintiff's warehouse in sections with the hardware in separate containers. The parts were then transported to the construction site where a mechanic and his helper spent 15 days hinging the panels together, installing the tracks and setting the assembled doors in place. Finally glass was purchased and mounted. Performance was completed, and in March 1970 Henderson received Metuchen's invoice.
In May 1970 Henderson, claiming a set-off based upon the costs of completing performance of a prior contract in which it is alleged Metuchen's predecessor was involved, sent a check for $1,278 to Metuchen, in violation of the terms of *79 the contract. On February 23, 1976 this action for the balance of the contract price was instituted.
Which statute properly applies depends upon how the contract may be most accurately characterized  as one for the sale of goods (as defined in N.J.S.A. 12A:2-105(1)) plus incidental services, or as one for construction services with the subcontractor furnishing materials as well as labor. The characterization issue, although briefly raised in E.A. Coronis Assocs. v. M. Gordon Constr. Co., 90 N.J. Super. 69, 74 (App. Div. 1966), has not been resolved in post-uniform Commercial Code New Jersey case law.
Whether the contract underlying this action is governed by the U.C.C. in general and N.J.S.A. 12A:2-725 in particular turns upon the meaning given to "goods" in N.J.S.A. 12A:2-105(1). New Jersey Study Comment 1 following the above section is instructive. It is there stated:
The Federal District Court using New Jersey law, has held that this definition is to be construed broadly. * * * Not all courts have given the word "goods" such a broad construction, however, and the changes of Sales Act terminology made by subsection 2-105 of the Code appear designed to overturn the cases handed down in other states which seem unnecessarily restrictive. Most of these cases involve situations in which the seller not only sells goods but agrees to install them. Where the installation aspect of the transaction dominates, many courts have held that the transaction does not involve "goods" but "work and labor". * * * Since the "things" involved in these cases are movable, the Code would treat them as "goods".[1] [Citations omitted]
In Bonebrake v. Cox, 499 F.2d 951 (8 Cir.1974), the court examined the rules of construction found in § 1-102, stating that the U.C.C.
*80 * * * is to be "liberally construed and applied to promote its underlying purposes and policies," which are, among others, "to simplify, clarify and modernize the law governing commercial transactions." The intent here was "simply that the law of commercial transactions be, so far as reasonable, liberal and nontechnical" and, to that end, that the Code "liberalize (`de-technicalize') important branches of commercial law." [at 955, quoting White and Summers, Handbook of the Law under the U.C.C., 14-15 (1972); footnote omitted]
Two years later the Seventh Circuit was faced with the question of whether a one-million-gallon water tank constituted goods as defined by the U.C.C. In answering this question in the affirmative the court stated:
We find ample support in the cases arising under the UCC itself that the scope of coverage of "goods" is not to be given a narrow construction but instead should be viewed as being broad in scope so as to carry out the underlying purpose of the Code of achieving uniformity in commercial transactions. The code, which by its own terms, § 1-102, is to be liberally construed, should be uniformly applied to achieve its purposes. [Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co. 532 F.2d. 572, 580 (1976), footnote omitted]
N.J.S.A. 12A:2-105 requires that, in order to be classified as goods, the subject matter of a contract must be "movable at the time of identification to the contract". This definitional section continues, excluding some "things" from U.C.C. coverage. But there is no exception for goods which require servicing before they can be used. See Bonebrake v. Cox, supra at 958.
Notwithstanding the trend to construe the U.C.C. broadly to foster uniformity, some courts have characterized contracts as involving primarily services, with the transfer of materials being so incidental to the services as to exclude coverage by the U.C.C. See, e.g., Rose Acre Farms v. L.P. Cavett Co., 151 Ind. App. 268, 279 N.E.2d 280 (Ct. App. 1972); Vernali v. Centrella, 28 Conn. Sup. 476, 266 A.2d 200 (Sup. Ct. 1970); Mainland v. Alfred Brown Co., 85 Nev. 654, 461 P.2d 862 (Sup. Ct. 1969); Mitchem v. Johnson, 7 Ohio St.2d 66, 218 N.E.2d 594 (Sup. Ct. 1966), *81 and Schenectady Steel Co. v. Bruno Trimpoli General Construction Co., 43 A.D.2d 234, 350 N.Y.S.2d 920 (App. Div. 1974), aff'd (with the New York Court of Appeals explicitly refraining from taking a position on this issue) 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974), involving respectively the sale and installation of blacktop, construction of a house with a builder furnishing all materials and labor, construction of electrical equipment, construction and sale of a house, and finally sale and erection of structural steel in the construction of a bridge.
Those cases involve building useful improvements out of raw materials. Here, prefabricated but disassembled doors were put together and installed. More closely analogous is Bonebrake v. Cox, supra.
It is apparent that at some point the service element may so dominate the subject matter of a contract as to bring it outside U.C.C. coverage. An agreement to paint a house is a classic example of this situation. In Bonebrake v. Cox, supra, the Eighth Circuit was faced with the task of enunciating a test to cover borderline cases. There the issue was whether the four-year U.C.C. limitation period barred an action on allegedly defective used bowling equipment which had been supplied and installed by defendant. The equipment was as follows:

 10 Lane beds complete with one piece gutter, tail planks,
 kickbacks, etc.
 5 Magic circle underlane ball returns
 10 Score chairs
 Fibre glass seating (for 10 lanes)
 1 Streamlined bubble ball cleaning machine
 5 Lockers-5 Radarays
 63 Assorted house balls
 3 Ball storage racks
 50 Pair rental shoes
 Foundation material

for the total price of $20,000.
As is the case here, Bonebrake involved the purchase of manufactured goods which were useless without a substantial *82 amount of labor. One lump sum was charged for the equipment and its installation. In applying U.C.C. § 2-725 to a nondivisible mixed contract, the Eighth Circuit set forth a test which was later approved by the Seventh Circuit in Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co., supra:
* * * the cases presenting mixed contracts of this type are legion. The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom). [Bonebrake, supra at 960, footnote omitted]
See also, Cleveland Lumber Co. v. Proctor and Schwartz, Inc., 397 F. Supp. 1088 (N.D. Ga. 1975), where the court applied U.C.C. § 2-725 rather than the general Georgia contracts statute of limitations because the essence of the contract was a sale of goods, a wood drying kiln, with design and installation services being merely incidental.
It cannot be denied that the overhead doors were useless without the performance of installation services. "Services always play an important role in the use of goods, whether it is the service of transforming the raw materials into some usable product or the service of distributing the usable product to a point where it can be easily obtained by the consumer." Nordstrom, Handbook of the Law of Sales, 47 (1970). This observation is applicable to installation.
When presented with two elements of a contract, each absolutely necessary if the subject matter is to be of any significant value to the purchaser, it is a futile task to attempt to determine which component "is more necessary." Thus the Bonebrake test looks to the predominant purpose, the thrust of the contract as it would exist in the minds of reasonable parties. There is no surer way to provide for predictable results in the face of a highly artificial classification system.
*83 Applying the test here, we find the predominant reason for the agreement to have been the procurement of overhead doors, with the installation services being incidental. The contract is, therefore, governed by the U.C.C., and the four-year limitation period of N.J.S.A. 12A:2-725 is properly applicable. As this period had run prior to the initiation of this action, judgment is directed against plaintiff and in favor of defendant.
NOTES
[1] It should be noted that this view is not shared by all jurisdictions. Thus the Appellate Court of Illinois saw "no material difference between the definition of `contract for sale' set forth in Section 2-106 (1) of the Uniform Commercial Code and that of a `contract to sell goods' in Section 1 of the Uniform Sales Act." J & R Elec. Div., J.O. Mory Stores v. Skoog Const. Co., 38 Ill. App.3d 747, 348 N.E.2d. 474, 477 (App. Ct. 1976).