# IN THE COURT OF APPEALS OF IOWA

No. 14-0632
Filed April 22, 2015

**DES MOINES FLYING SERVICES, INC.,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**AERIAL SERVICES INC., CEDAR VALLEY
AVIATION, LLC, and KIRK P. FISHER,**
        Defendants-Appellants/Cross-Appellees.
_____

Appeal from the Iowa District Court for Black Hawk County, Andrea J. Dryer, Judge.

The owner of an airplane appeals the district court's summary judgment in favor of the seller/installer of a faulty windshield. The seller/installer cross-appeals the damage calculation. **AFFIRMED ON APPEAL; REMANDED ON CROSS APPEAL.**

John R. Walker Jr. and Kate B. Mitchell of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellants.

Steven Lawyer of Law Firm of Steven V. Lawyer & Associates, P.L.C., West Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

This case involves the sale and installation of an airplane windshield that cracked in midflight. The airplane's owner, Aerial Services, Inc., claims Des Moines Flying Service, Inc. (DMFS), which sold and installed the windshield, breached an implied warranty of merchantability under Iowa Code section 554.2314 (2011). The district court granted summary judgment for DMFS, ruling the seller-installer was immune from suit under Iowa Code section 613.18. The court awarded DMFS damages in the amount of $23,046.08 for its costs in replacing the windshield.

Aerial appeals, contending section 613.18 applies only to tort suits, and, therefore, does not provide DMFS immunity on this commercial contract claim. DMFS cross-appeals contending the district court improperly calculated pre-judgment interest on its damage award. Finding the plain language of section 613.18 allows its application here, we affirm the district court's ruling on immunity. On the cross appeal, we remand for entry of a revised order on pre-judgment interest.

I. **Background Facts and Proceedings**

Aerial performs aerial photography, mapping, orthophotography,[1] and other services. Given the nature of its business, the company owns and operates a Piper Cheyenne II airplane. To take aerial photographs, this plane flies at high air speeds and altitudes of 24,000 feet.

---

[1] An orthophotograph is an aerial photo that can be used to measure true distances.

Aerial delivered the Cheyenne to DMFS on February 20, 2009, for a routine one-hundred hour inspection. DMFS, certified by the Federal Aviation Administration, repairs airplanes and sells airplane parts. It also serves as an authorized dealer and service center for Piper aircraft and parts. After inspecting the Cheyenne, DMFS customer service representatives recommended replacement of the pilot and co-pilot windshields. To replace a windshield in an aircraft, the service center may install only "the exact part number windshield" used in the original airplane design, or a specifically authorized alternative part. DMFS installed an approved co-pilot windshield in the Cheyenne on August 28, 2009.[2]

Just ten months later, on June 24, 2010, the windshield cracked while the Cheyenne was flying at an altitude of 24,000 feet. The pilot was able to do an emergency descent to depressurize the plane and flew the plane to Des Moines. DMFS employees inspected the plane, removed and replaced the broken windshield, and returned the plane to Aerial on June 30, 2010.

Aerial sent the cracked windshield to Trident Engineering Associates to determine the source of the damage. Trident determined the crack resulted from a grind mark on the edge of the exterior glass which raised the local stress on the edge and ply. This flaw occurred during the manufacturing of the windshield.[3]

---

[2] DMFS received the windshield from Piper on January 26 or 27, 2009. DMFS employees inspected it for any visible damage. After the inspection, they stored it in an appropriate manner. Aerial makes no argument on appeal that DMFS did not store the windshield correctly or should have noticed a visible defect.

[3] PPG Industries of Huntsville, Alabama, manufactured the windshield.

DMFS sent Aerial an invoice totaling $23,046.08 for the cost and installation of the replacement windshield.[4] Aerial refused to pay. DMFS sued for breach of contract.

Aerial answered, making seven counterclaims and raising three affirmative defenses. Among these claims, Aerial alleged DMFS breached the implied warranty of merchantability.

DMFS responded by arguing it was immune from any suit based on Iowa Code section 613.18. DMFS also argued the transaction was not covered by Iowa's Uniform Commercial Code as it was a contract for services, not goods.

On February 7, 2013, the district court granted summary judgment in favor of DMFS, finding it was immune from suit under section 613.18. On February 24, 2014, following a hearing, the district court ruled in favor of DMFS, finding Aerial owed DMFS $23,046.08 for parts and labor associated with installation of the new windshield on June 29, 2010. DMFS filed a motion to enlarge, asking the court to find it was entitled to pre-judgment interest on the amount of the invoice. The district court ruled DMFS was entitled to pre-judgment interest of $3621.08 in addition to the original judgment. Aerial appeals the ruling of immunity. DMFS cross-appeals from the calculation of the pre-judgment interest.

## II.     Standard of Review

We review the district court's summary judgment ruling for correction of legal error. *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 500 (Iowa 2013). Summary judgment is appropriate when the record reveals no genuine

---

[4] The previous windshield came with a six-month warranty, but that warranty had expired at the time of the failure.

issues of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3*); see Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012). When reviewing a motion for summary judgment, we view the facts in the light most favorable to the nonmoving party, and give the nonmoving party every legitimate inference that can be reasonably deduced from the record. *Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 774 (Iowa 2013).

We likewise apply an errors-at-law review to questions of statutory interpretation, *Schaefer v. Putnam*, 841 N.W.2d 68, 74 (Iowa 2013), as well as the calculation and award of pre-judgment interest. *Gosch v. Juelfs*, 701 N.W.2d 90, 91 (Iowa 2005).

## III.    Analysis

This case started with DMFS demanding payment for a replacement windshield. This appeal involves Aerial's counterclaim that DMFS breached an implied warranty of merchantability under Iowa Code section 554.2314 by selling a defective product. Section 554.2314 appears in Article 2 of Iowa's Uniform Commercial Code (UCC), which applies to the sale of goods. Iowa Code § 554.2102. As a threshold argument for affirming the district court, DMFS argues by installing the new windshield, it was not primarily selling a good, but performing a service. We will address this argument before analyzing the intersection between the warranty provision in section 554.2314 and the immunity provision in section 613.18.

**A. Application of Uniform Commercial Code**

The Iowa UCC applies to mixed contracts for goods and services. *See Semler v. Knowling*, 325 N.W.2d 395, 398 n.1 (Iowa 1982). To determine whether contracts for goods and services are covered by the UCC we examine "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved." *M & W Farm Serv. Co. v. Callison*, 285 N.W.2d 271, 274 (Iowa 1979) (citing *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)).

DMFS argues the primary purpose of its contract with Aerial was the installation of the windshield, with its sale only incidental to that purpose. The DMFS invoice dated August 31, 2009, showed the cost of the pilot and co-pilot windshields were each $19,323.63. The "labor totals" listed in the invoice for removing the windows, prepping the frames, and installing the new windows were $6300. The cost disparity between the goods and the labor suggests the predominant factor—the gist—of the contract was for the specialized part. *See RMP Indus., Ltd. v. Linen Center*, 386 N.W.2d 523, 528 (Iowa Ct. App. 1986) (finding predominant factor in transaction for installation of shelving was for services where proposal for labor cost was $2600 and shelves cost only $250).

The instant case is similar to *Bonebrake*, where the owner of a bowling alley entered into a contract for the sale and installation of lane beds, gutters, and ball returns to replace similar equipment damaged by a fire. *Bonebrake*, 499 F.2d at 953. The Eighth Circuit held the contract focused on the replacement of

the damaged equipment and the service of installation was incidental to the sale. *Id.* at 960. Here, Aerial brought its plane to DMFS for an inspection and agreed to purchase certain parts from DMFS to replace those that were worn, including a new co-pilot windshield. The windshield's installation was secondary to its purchase. Therefore, Iowa's UCC applies to this contract.

## B. Immunity from Suit for Breach of Implied Warranty

Having determined Iowa Code chapter 554 applies to this transaction, we turn to Aerial's claim that DMFS breached an implied warranty of merchantability when it sold a defective windshield in August 2009. In light of the breach, Aerial argues it should not be held responsible for the cost of the replacement windshield in 2010.

The implied warranty of merchantability is set forth in section 554.2314, which provides, in pertinent part:

> 1. Unless excluded or modified (section 554.2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.
> . . . .
> 2. Goods to be merchantable must be at least such as
>     a. pass without objection in the trade under the contract description; and
>     . . . .
>     c. are fit for the ordinary purposes for which such goods are used; and
>     d. run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>     e. are adequately contained, packaged, and labeled as the agreement may require; and
>     f. conform to the promises or affirmations of fact made on the container or label if any.

Iowa Code § 554.2314.

In response, DMFS argues the district court was correct in finding it was immune from Aerial's warranty action by virtue of section 613.18(1)(a). That section reads as follows:

> 1. A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:
> a. Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.

Iowa Code § 613.18(1)(a).

It is undisputed DMFS did not assemble, design, or manufacture the windshield. Based on evidence from Trident engineers, the district court found the windshield did not fail because of improper storage or installation. The district court, in granting summary judgment in favor of DMFS, found Aerial did "not set forth specific facts from which a reasonable finder of fact could determine that the co-pilot windshield failure arose from anything other than, or in addition to, a defect in the original design or manufacture of the product." Accordingly, the district court decided section 613.18(1)(a) barred Aerial's claim for breach of implied warranty of merchantability against DMFS.

On appeal, Aerial faults the district court for its interpretation of section 613.18 as barring a claim for the breach of an implied warranty of merchantability sounding in contract under section 554.2314. Aerial contends section 613.18 should be read to grant immunity only from suits based upon a breach of implied

warranty of merchantability sounding in tort.[5]   Aerial argues if section 613.18 is interpreted to bar suits alleging both tort and contract violations, buyers who purchase a product from a seller (who is not also an assembler, designer, or manufacturer) are without any remedy for purely economic losses.[6]

We address Aerial's argument by first looking to the language of section 613.18.  When interpreting a statute, if the text is plain and its meaning is clear, we do not need to venture beyond the express terms.  *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 519 (Iowa 2012) (explaining that when the legislature does not define terms, we may refer to prior case law, similar statutes, dictionary definitions, and common usage).  Section 613.18(1)(a) extends immunity to nondesigning, nonmanufacturing sellers "from any suit based upon *strict liability in tort* or *breach of implied warranty of merchantability* which arises solely from an alleged defect in the original design or manufacture of the product."  Iowa Code § 613.18 (2013) (emphasis added.).  The meaning of the two italicized phrases is key to interpreting the immunity provision.

Although litigants often invoke these two causes of action in tandem, *see, e.g.*, *Kolarick v. Cory Intern. Corp.*, 721 N.W.2d 159 (Iowa 2006), strict liability in tort and breach of the implied warranty of merchantability are separate theories

---

[5] Aerial points to the title of the statute "Limits on products liability of nonmanufacturers" as support for its position that the immunity provision is limited to tort suits because the term "products liability" relates to liability arising from injury or damage resulting from the use of a product.  *See Bingham v. Marshall & Huschart Mach. Co.*, 485 N.W.2d 78, 79 (Iowa 1992).  We are not convinced by this argument.  The title or headnote supplied by the code editor is not considered part of the statute.  *See State v. Kehoe*, 804 N.W.2d 302, 312 (Iowa Ct. App. 2011).

[6] Purely economic losses, like those to the product itself, usually result from the breach of a contract and are compensable in contract, not tort actions.  *See Richards v. Midland Brick Sales Co., Inc.*, 551 N.W.2d 649, 651 (Iowa Ct. App. 1996).

of liability against distributors of defective products. *See generally Hawkeye Sec. Ins. Co. v. Ford Motor Co.*, 199 N.W.2d 373, 382 (Iowa 1972) (observing not many cases will involve both theories presented sufficiently for consideration by a jury). "Recovery under a theory of strict liability in tort results from a public policy decision that protects the consumer from the inevitable risks of damage or harm brought about by mass production and complex marketing conditions." *Id.* By comparison, an action for the breach of the implied warranty of merchantability under section 554.2314 is "based on a purchaser's reasonable expectation that goods purchased from a 'merchant with respect to goods of that kind' will be free of significant defects and will perform in the way goods of that kind should perform." *Van Wyk v. Norden Laboratories, Inc.*, 345 N.W.2d 81, 84 (Iowa 1984). Warranty claims under the Iowa UCC are based on contract, not tort law. *See Barnhill v. Iowa Dist. Court*, 765 N.W.2d 267, 274 (Iowa 2009) (interpreting passage from *Tomka v. Hoechst Celanese Corp.,* 528 N.W.2d 103, 107 (Iowa 1995)).

Despite the divergent roots of these two theories, Aerial maintains the legislature, in passing section 613.18, only intended to grant immunity from "claims based on the breach of implied warranty of merchantability in *tort.*" We disagree. The legislature did not include that limitation in the plain language of the statute. Section 613.18(1)(a) grants immunity "from *any* suit based upon . . . breach of implied warranty of merchantability" without exception for suits claiming economic losses based in contract law.

The legislature passed section 613.18 in 1986, well after Iowa's adoption of the UCC in 1965. For purposes of interpreting the later enactment—which included the phrase "implied warranty of merchantability"—we presume lawmakers were aware of section 554.2314 defining the implied warranty of merchantability, yet did nothing to limit immunity under section 613.18(1)(a) to warranty claims allowing recovery for damages generally associated with tort law. *See generally Jahnke v. City of Des Moines*, 191 N.W.2d 780, 787 (Iowa 1971) (relying on proposition legislature knew existing state of law and prior judicial interpretations). If, as Aerial contends, the legislature had intended to draw a clear line between immunity for tort claims and recovery for contract claims against non-manufacturing sellers, it would have expressed that distinction in the words of section 613.18. When interpreting a statute, we are bound by what the legislature actually said, not by what it should have said. *Iowa Dep't of Transp. v. Soward*, 650 N.W.2d 569, 571 (Iowa 2002). Section 613.18, as written, grants a nondesigning, nonmanufacturing retailer like DMFS immunity from any suit based upon a breach of the implied warranty of merchantability arising solely from an alleged defect in the original design or manufacture of the product. *See Housley v. Orteck Intern. Inc.*, 488 F. Supp. 819, 831-32 (S.D. Iowa 2007).

Aerial's core complaint is that interpreting the immunity statute as written leaves it and other buyers without a remedy for economic losses. Aerial contends *Tomka* held that although a purchaser of synthetic growth hormones for cattle could not sue remote manufacturers for consequential economic losses,

the purchaser "was not left without a remedy. He bought the hormones from local veterinarians and he may look to them for recovery under warranty theories." *See Tomka*, 528 N.W.2d at 108. We are not convinced *Tomka* aids Aerial. The supreme court did not specifically say Tomka could recover from the local sellers under the implied warranty of merchantability. *Id.* Moreover, the quoted sentence is dicta, and not critical to *Tomka's* holding; section 613.18 is not discussed in *Tomka*.

Moreover, the exclusion of remedies for buyers in Aerial's position is not cause to ignore the plain language of the statute. In many jurisdictions, legislation like section 613.18 immunizes nonmanufacturing defendants under certain circumstances,[7] *see Restatement (Third) of Torts: Products Lia*bility § 1 cmt *a.* (1998), "even though this immunity may occasionally mean a consumer is left with no remedy at all (*Restatement (Third) of Torts: Products Liability* § 1 cmt *e* hist. n. 2 (1998)." *See Chraca v. U.S. Battery Mfg. Co.*, 24 N.E.3d 183, 186 (Ill. App. Ct. 2014).

Aerial alternatively argues even if it is barred by section 613.18 from suing DMFS for consequential economic losses under Iowa Code section 554.2715; it should be able to recover direct economic losses under section 554.2714, because to hold otherwise "would impede the core purpose of the UCC." We cannot decipher that distinction from the language in section 613.18. The provisions grants immunity from *any* suit based upon a breach of implied

---

[7] Not all jurisdictions with similar immunity clauses include both theories; "claims for breach of implied warranty of merchantability are covered by Iowa Code § 613.18 but not mentioned in Minnesota Statutes § 544.41." *Johnson v. American Leather Specialties Corp.*, 578 F. Supp. 2d 1154, 1164-65 (N.D. Iowa 2008).

warranty of merchantability related to a design or manufacturing defect, even if the only losses alleged are damage to the product itself.

The district court was correct in granting summary judgment for DMFS based on the plain language of the immunity statute.

### C. Pre-judgment interest

In response to a motion to enlarge filed by DMFS, the district court granted pre-judgment interest in the amount $3621.08. In its cross-appeal, DMFS challenges the district court's calculation of the interest. Aerial offers no argument concerning the pre-judgment interest amount.

Citing Iowa Code section 535.2(1)(b),[8] DMFS seeks interest from the date that the invoice for the windshield repairs became due (July 30, 2010) to the date of judgment (February 21, 2014), which was three years, six months and twenty-two days, or 3.56438 years. According to DMFS's calculations, when the principal owed ($23,046.08) is multiplied by five percent interest and then by 3.56438 years, the interest due equals $4107.25. Adding this amount of interest would bring the total award to $27,153.33.

We do not agree with the computation provided by DMFS. Determining pre-judgment interest involves two statutes: section 535.2(1)(b) and section 535.3. *See Matter of Mt. Pleasant Bank & Trust Co.*, 455 N.W.2d 680, 685 (Iowa

---

[8] The pertinent part of the code section reads:

> 1. Except as provided in subsection 2, the rate of interest shall be five cents on the hundred by the year in the following cases, unless the parties shall agree in writing for the payment of interest at a rate not exceeding the rate permitted by subsection 3:
>
> . . . .
>
> b. Money after the same becomes due.

Iowa Code § 535.2(1)(b).

1990) ("Confusion persists about the running of interest on judgments."). Under section 535.2(1)(b), interest is allowed at five percent on money from the time it is due until the date the suit is filed. *Id.* at 685-86; *Coachmen Indus., Inc. v. Security Trust and Sav. Bank*, 329 N.W.2d 648, 651 (Iowa 1983). In this case, five percent interest would be due on the principal amount of $23,046.08 between July 30, 2010 and October 22, 2010, which is .23 years. Under that calculation, the pre-commencement interest equals $265.03.

After the commencement of the suit, interest accrues at the rate determined under section 535.3(1). *Coachman*, 329 N.W.2d at 651.[9] Section 535.3(1) now cross references the interest rate in section 668.13. Section 668.13(3) provides: "Interest shall be calculated as of the date of judgment at a rate equal to the one-year treasury constant maturity published by the federal reserve in the H15 report settled immediately prior to the date of the judgment plus two percent. The state court administrator shall distribute notice monthly of that rate and any changes to that rate to all district courts."

The judgment in this case was entered on February 21, 2014. The rate published on February 18, 2014, was .12 percent. *See* http://www.federalreserve.gov/releases/h15/20140218. Adding two percent results in an interest rate of 2.12 percent for the time period from October 22, 2010 until judgment, which was 3.33 years. The principal plus interest found under section 535.2—which was $23,311.11—must be multiplied by 2.12 percent interest then by 3.33 years, for interest totaling $1645.67. When this post-

---

[9] When *Coachmen* was decided, section 535.3 set out a fixed interest rate of ten percent per year. The legislature amended section 535.3 to its current construction in 1997.

commencement interest is added to $23,311.11, the total amount due is $24,956.78 (plus post-judgment interest).  We remand for entry of this award.

**AFFIRMED ON APPEAL; REMANDED ON CROSS APPEAL.**