396 S.E.2d 463

**ELKINS MANOR ASSOCIATES, a Limited Partnership, and Elkins Manor, Inc., a Corporation,**

**v.**

**ELEANOR CONCRETE WORKS, INC., a Corporation**

**v.**

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Third–Party Plaintiff Below**

**v.**

**Lawrence D. BUTCHER, Third–Party Defendant Below.**

No. 19272.

Supreme Court of Appeals of West Virginia.

July 25, 1990.

---

Richard W. Gallagher, Jeffrey A. Kimble, McNeer, Highland & McMunn, Clarksburg, for Elkins Manor Associates.

David Nibert, Kingery & Nibert, Point Pleasant, for Eleanor Concrete Works, Inc. and Lawrence Butcher.

James R. Watson, Randall C. Light, Steptoe & Johnson, Clarksburg, for U.S. Fidelity & Guar. Co.

MILLER, Justice:

Elkins Manor Associates and Elkins Manor, Inc., appeal from a final order of the Circuit Court of Randolph County, entered on January 17, 1989, which granted Eleanor Concrete Works, Inc., United States Fidelity and Guaranty Company, and Lawrence Butcher a directed verdict. We have reviewed the record, and we find that the trial court erred in directing a verdict. Accordingly, we reverse and remand the case for further proceedings consistent with this opinion.

I.

Elkins Manor Associates is a limited partnership which was formed to provide government subsidized housing for the elderly in Randolph County. Elkins Manor, Inc., is one of the general partners of the limited partnership.[1] After locating a site which complied with the Federal Housing Authority (FHA) requirements, Elkins Manor secured a twelve-month construction loan for $3,099,500 from the West Virginia Housing Development Fund (WVHDF).[2] In return, Elkins Manor agreed to comply with the guidelines of WVHDF and FHA. The controversy in this case involves Elkins Manor and one of the contractors on the housing project, Eleanor Concrete Works, Inc. (Eleanor).

1. Hereinafter Elkins Manor Associates and Elkins Manor, Inc., will be referred to interchangeably as Elkins Manor.

2. The total cost for completion of the project was $3,400,000. According to documents in the record, WVHDF is only permitted to loan up to 90 percent of the total projected cost.

Elkins Manor's evidence at trial revealed the following. On July 26, 1979, Elkins Manor and Eleanor entered into a contract in which Eleanor agreed to manufacture, deliver, and install pre-cast prestressed concrete planks for use as the floors and ceilings in the housing project. Eleanor was to provide the concrete for the first floor within eighteen days after the shop drawings had been approved and a one-half floor shipment of concrete every ten days thereafter.[3] Elkins Manor agreed to pay Eleanor a total of $159,400 for this service. The contract further required Eleanor to obtain a performance bond guaranteeing the completion of its work. Eleanor obtained a performance bond from United States Fidelity and Guaranty Company (USF & G).

The first floor of the project was installed by Eleanor in September, 1979. In October, 1979, inspectors from FHA discovered that the installed planks had not been anchored in accordance with the design specifications of the project.[4] Upon closer examination, the inspectors observed that several of the planks were cracked and warped. Believing that the planks were unsafe, the inspectors gave Elkins Manor two alternatives: (1) to remove all of the planks which had already been installed, or (2) to test the planks to assure that they complied with the standards prescribed by the American Concrete Institute (ACI). Both FHA and WVHDF require that all subsidized projects comply with these standards and this requirement was a part of Eleanor's contract.[5] Eleanor decided to have the concrete tested.

Meanwhile, representatives from WVHDF inspected Eleanor's plant in Putnam County and determined that the plant's manufacturing process did not comply with the standards set by ACI or by the licensor of the product, Spiroll. WVHDF refused to allow any of Eleanor's planks to be used on the Elkins Manor project until Eleanor obtained approval from both the ACI and Spiroll. Eleanor did not obtain the necessary approval until January, 1980.

During February, 1980, delivery and installation of the concrete planks proceeded relatively on time. In March, Eleanor experienced financial difficulties and did not have any trucks in which to make the deliveries to the Elkins Manor project.[6] Because of time limitations in its construction financing, Elkins Manor was forced to hire a trucking company to load and deliver the planks. Often, when a truck was sent down to pick up the concrete planks, the truck would return empty or half full. Eleanor also failed to provide either the manpower to install the planks or the crane necessary to remove them from the truck onto the construction site, as required by its contract.[7] Consequently, Elkins Manor had to rent its own crane and use its own personnel to install the planks. Installation of the planks required removing them

---

3. The contract provided, in pertinent part:

The Subcontractor will furnish all labor, tools, equipment, and material to perform all work in connection with Pre-Cast Prestressed concrete slabs shown on the drawings and called for in the Specifications to make a complete and acceptable job.

The following items are included, but not limited to, these items:

(1) Furnish, deliver, and install all Pre-Cast required for the project.

(2) Furnish and Install all grout required as shown on the Contract Drawings or called for in the Specifications in connection with the Pre-Cast Prestressed Concrete Deck.

(3) Furnish a crane to perform this work, names of local crane rentals will be supplied to the Subcontractors by Elkins Manor Associates in an effort to help the cost of this work.

\*    \*    \*    \*    \*    \*

(10) Delivery Schedule

(a) First half-floor shipment to be delivered within 18 calendar days after approved shop drawings.

(b) Remaining shipments of one-half floor per shipment to be made within 10 days of the last shipment.

4. The architectural design of the project was incorporated into the contract between Elkins Manor and Eleanor.

5. The applicable language can be found in Article 6 of the contract.

6. Eleanor's plant in Putnam County is approximately 180 miles from the Elkins Manor project.

7. *See* note 3, *supra.*

from the truck, leveling them, anchoring the slabs to the outside walls, and grouting between the planks.

Although Elkins Manor attempted to secure another company to make the pre-cast concrete, because of the time constraints of the construction loan, the estimates provided by the other companies were very uneconomical. According to Daniel Siegel, president of Elkins Manor, a decision was made to "limp along" with Eleanor even though it was not fulfilling its contractual obligations. Elkins Manor frequently notified USF & G of the difficulties they were experiencing with Eleanor. These notices included at least three phone calls to the insurance company and two responses to status inquiries, all of which informed USF & G that Eleanor was failing to comply with the terms of the contract. USF & G did not respond to any of these notices.

After the project was completed in December, 1980, Elkins Manor filed suit against Eleanor and USF & G for breach of the contract. Eleanor filed a counterclaim seeking payment for the remaining amount owed on the contract.[8] The trial commenced on June 21, 1988. At the close of Elkins Manor's case, Eleanor and USF & G filed motions for directed verdict. The trial court granted these motions, finding that Elkins Manor provided insufficient evidence that Eleanor had breached the contract. Alternatively, the trial court found that if a breach had occurred, it was excused pursuant to Section 615(a) of the Uniform Commercial Code (UCC), W.Va. Code, 46–2–615(a).

Moreover, the trial court found that Elkins Manor failed to provide adequate or timely notice to USF & G of Eleanor's default; therefore, it granted USF & G's motion for directed verdict. Finally, the trial court ruled that Eleanor's counterclaim for the remaining amount due under the contract should be offset by Elkins Manor's cost in shipping, installing, anchoring, and grouting the concrete planks. Elkins Manor moved for a new trial, and, in an order entered on January 17, 1989, the trial court denied this motion.

## II.

■ We have traditionally held that a verdict should not be directed against a plaintiff in a civil case unless he has failed to present a *prima facie* case. *See Jividen v. Legg,* 161 W.Va. 769, 245 S.E.2d 835 (1978). In determining whether a *prima facie* case has been established, it is incumbent upon the trial judge to weigh the evidence in the plaintiff's favor. *Blair v. Preece,* 176 W.Va. 532, 346 S.E.2d 50 (1986), *cert. denied,* 492 U.S. 923, 109 S.Ct. 3253, 106 L.Ed.2d 599 (1989). We explained this more fully in the Syllabus of *Nichols v. Raleigh–Wyoming Coal Co.,* 112 W.Va. 85, 163 S.E. 767 (1932):

> "Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence."

*See also Covey v. Fields,* 177 W.Va. 481, 354 S.E.2d 413 (1987); *Blair v. Preece, supra; Jenkins v. Chatterton,* 143 W.Va. 250, 100 S.E.2d 808 (1957).

## III.

■ When the evidence is viewed in the light most favorable to Elkins Manor, the directed verdict against it was error. Article II of the contract had a "time is of the essence" clause, and the detailed delivery schedule contained in the contract was not followed. The general rule is that where time is of the essence in the performance of a contract, a delay in performance beyond the period specified in the contract, unless caused by the other party or waived by such party, will constitute a breach of the contract, entitling the aggrieved party to terminate it. *See, e.g. Siegel v. Banker,* 486 A.2d 1163 (D.C.App.1984); *Phillips v. Green St. Corp.,* 143 Ind.App. 30, 237 N.E.2d 590 (1968); *Carriger v. Ballenger,* 628 P.2d 1106 (Mont.1981); *Western Irrigation Co., Inc. v. Reeves County Land*

---

**8.** Elkins Manor had paid Eleanor approximately $118,000 owed under the contract.

*Co.*, 233 S.W.2d 599 (Tex.App.1950). *See generally* 17A C.J.S. *Contracts* § 502 (1963).

Here, Elkins Manor did not terminate the contract, but rather elected to permit Eleanor to continue to perform. According to Elkins Manor, this was done because it was not possible to readily obtain another source of supply of the pre-stressed concrete planks within the time frame of the construction loan. The fact that Elkins Manor did not terminate the contract with its supplier because of the delay in performance does not mean that it has waived its right to seek damages occasioned by the delay in performance. It is generally held that an owner does not waive his right to damages occasioned by the contractor's delay in constructing a building by permitting the contractor to proceed with the work. *See, e.g., Carriger v. Ballenger, supra; Shalman v. Board of Educ.*, 31 A.D.2d 338, 297 N.Y.S.2d 1000 (1969); *Board of Regents v. S & G Constr. Co.*, 529 S.W.2d 90 (Tex.App.1975); *May v. Martin*, 205 Va. 397, 137 S.E.2d 860 (1964).

Other damages claimed by Elkins Manor were occasioned by Eleanor's financial inability to deliver and install its product, as required by the contract. As a consequence, Elkins Manor was required to hire a trucking company to transport the concrete planks to the construction site and pay to have them installed. This resulted in a partial failure of performance of the contract by Eleanor. Where there has been a partial or defective performance of the contract, we have applied the general rule set out in Syllabus Point 2 of *Trenton Construction Co. v. Straub*, 172 W.Va. 734, 310 S.E.2d 496 (1983):

 " '[T]he proper measure of damages in ... cases involving building contracts is the cost of repairing the defects or completing the work and placing the con-

struction in the condition it should have been if properly done under the agreement contained in the building contract.' *Steinbrecher v. Jones*, 151 W.Va. 462, 476, 153 S.E.2d 295, 304 (1967)."

Finally, the delay caused by Eleanor's failure to produce a product in conformity to the contract specifications is attributable to Eleanor. The right of the FHA to inspect was embodied in the contract. It is generally held that where a construction contract provides for inspection of the work to assure compliance with the contract specifications, the contractor is required to remedy such defects found at its own expense and is chargeable with the delay occasioned thereby. *See Duffy v. Woodcrest Bldrs., Inc.*, 2 Conn.Cir.Ct. 137, 196 A.2d 606 (1963); *Mandina v. Fulco*, 43 So.2d 310 (La.App.1949); *Security Sewage Equip. Co. v. McFerren*, 14 Ohio St.2d 251, 237 N.E.2d 898 (1968).

## IV.

It appears that the trial court relied on Eleanor's claim that Section 615(a) of the UCC, W.Va.Code, 46–2–615(a), provides some amelioration for its delays in delivering the concrete planks.[9] Most courts hold that the UCC does not generally apply to alter the terms of a construction contract. The reasoning often used, which may not be entirely satisfying, begins by pointing out that the sales portion of the UCC, W.Va.Code, 46–2–101, *et seq.*, deals with the sale of goods. "Services" are not included in the definition of "goods." *See* W.Va.Code, 46–2–102; W.Va.Code, 46–2–105 (defines the term "goods"). Consequently, a construction contract which involves the supplying of labor and material is not controlled by the UCC if the service component is the predominant factor in the contract. This test was set forth in

---

9. W.Va.Code, 46–2–615(a), provides:
 "Except so far as a seller may have assumed a greater obligation and subject to the preceding section [§ 46–2–614] on substituted performance:
 "(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of

his duty under a contract for sale if performance as agreed has been made impractical by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid."

*Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974), which many courts have adopted:

"The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.,* contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.,* installation of a water heater in a bathroom)."

*See, e.g., Pittsburgh–Des Moines Steel Co. v. Brookhaven Water Co.,* 532 F.2d 572 (7th Cir.1976); *Care Display, Inc. v. Diddle–Glaser, Inc.,* 225 Kan. 232, 589 P.2d 599 (1979); *Burton v. Artery Co., Inc.,* 279 Md. 94, 367 A.2d 935 (1977); *Meyers v. Henderson Constr. Co.,* 147 N.J.Super. 77, 370 A.2d 547 (1977); *Air Heaters, Inc. v. Johnson Elec., Inc.,* 258 N.W.2d 649 (N.D. 1977); *Freeman v. Shannon Constr., Inc.,* 560 S.W.2d 732 (Tex.App.1977). *See generally* 67 Am.Jur.2d *Sales* § 40 (1985); Annot., 5 A.L.R.4th 501 (1981).

What is often overlooked is that the UCC evolved from commercial sales where goods were often bought and sold without any extensive contract document spelling out the rights and remedies of the parties. The UCC is derived from a variety of legal sources that were utilized to categorize the commercial rules, many of which had been established by merchants dealing with each other.[10] It is also important to understand that the sales section of the UCC itself recognizes that specific contractual terms may supercede its provisions.[11]

Thus, it would appear that the main purpose of the UCC is to fill in the gaps of a sales agreement which is either ambiguous or contains no express statement as to a particular right or duty. In contrast, a building construction agreement often contains detailed contract provisions and specifications. Moreover, the ultimate "owner" of the facility does not directly buy the goods. These are supplied by contractors or subcontractors who in turn have purchased the goods from third parties.

Moreover, the *Bonebrake* test, which states that where both goods and services are furnished, the "predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service with goods incidentally involved ... or is a transaction of sale, with labor incidentally involved," is too subjective to provide any rational analysis of most building contracts. In virtually any building contract, if the total cost of the project were considered, the "predominant factor" would almost always be the cost of materials incorporated into the building. Thus, under *Bonebrake,* the UCC would control, unless the "predominant factor" were left entirely to a court's own intuition.[12]

■ Certainly, independent of any overall formulation, it can be clearly stated that

---

**10.** 1 J. White & R. Summers, *Uniform Commercial Code* 6–7 (3d ed. 1988), put the matter this way:

"As Professor Grant Gilmore once put it, the Code 'derives from the common law [and] assumes the continuing existence of a large body of pre-Code and non-Code law on which it rests for support, [without which the Code] could not survive.' Much of the pre-Code and non-Code law to which Professor Gilmore refers is case law from such fields as contracts, agency, and property, which comes into play via 1–103."

**11.** *See, e.g.,* W.Va.Code, 46–2–208(2) (course of performance or practical construction to interpret contract cannot override express contract terms); W.Va.Code, 46–2–209 (modification of contract cannot override express contract term excluding modification); W.Va.Code, 46–2–210 (delegation of performance "unless otherwise agreed" indicates if express contract term precludes delegation, this section not available).

W.Va.Code, 46–2–303, aptly makes the point. It states that "where this article allocates a risk or burden as between the parties 'unless otherwise agreed,' the agreement may not only shift the allocation but may also divide the risk or burden." The official comment under this section states: "This section is intended to make it clear that the parties may modify or allocate 'unless otherwise agreed' risks or burdens imposed by this Article as they desire, always subject, of course, to the provisions on unconscionability." The phrase "unless otherwise agreed" or its equivalent appears throughout the sales article of the UCC.

**12.** From examining the cases annotated in 5 A.L.R.4th 501 (1981), which relates to mixed contracts for the sales of goods and services, it appears that a rather intuitive approach is used.

the provisions of the UCC, W.Va.Code, 46–2–101, *et seq.*, are not available to modify the express language of a building construction contract. Moreover, we conclude that there is a presumption that the sales provisions of the UCC will not apply to a building construction contract unless the party seeking a UCC right is able to demonstrate substantial justification for its use.[13]

In this case, as earlier noted, Eleanor asserts that W.Va.Code, 46–2–615 excuses its delay in delivering the concrete planks. Even under our first test, this UCC section can not alter express contract language. The contract contained a "time is of the essence" clause, which imposes a higher duty of performance. We also observe that W.Va.Code, 46–2–615 begins with the statement, "[e]xcept so far as a seller may have assumed a greater obligation." As a consequence, the court erred in holding this section to be a legal defense for the failure of Eleanor to perform.

## V.

USF & G, as the surety on Eleanor's performance bond, asserts that its directed verdict was proper because it was not provided a proper notice of Eleanor's default. We disagree. Initially, we advert to the general rule set out in *Cecil I. Walker Machinery Co. v. Stauben, Inc.*, 159 W.Va. 563, 567–68, 230 S.E.2d 818, 820 (1976), where we said: "Likewise, when the surety is a corporation and supplies bonds for a consideration, the courts will construe the obligations of the bond most strongly against the surety. *See Hicks v. Randich*, 106 W.Va. 109, 144 S.E. 887 (1928)."

In this case, there was no notice provision specified in the bond. As we have earlier recited in the factual section, USF & G was informed by way of telephone calls to its agent about Eleanor's defaults on the contract. Rather than take any initiative to become more acquainted with the situation, USF & G appears to have adopted a wait-and-see attitude. We find the general rules set out in 17 Am. Jur.2d *Contractors Bonds* § 30 (1964) to be applicable:

"An owner's failure to give notice to the surety of the principal's default does not discharge the surety unless the bond specifically provides for such notice.

"A provision to give notice of default is, of course, valid provided it is reasonable, and is a condition precedent to an action so based. Where no time is specified as to the giving of notice of default, it must be given within a reasonable time under all the circumstances. If, on the other hand, the surety already has knowledge or is chargeable with knowledge of the default, a failure to give the notice required by the bond does not relieve it from liability." (Footnotes omitted).

Other courts have concluded that where, as here, the surety bond did not provide for specific notice to the surety of the contractor's default, none was required. *E.g., Robertson Lumber Co. v. Progressive Contractors, Inc.*, 160 N.W.2d 61 (N.D. 1968); *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 492 A.2d 1306 (1985); *Menorah Nursing Home, Inc. v. Zukov*, 153 A.D.2d 13, 548 N.Y.S.2d 702 (1989); *Insta/Com, Inc. v. Aetna Casualty & Sur. Co.*, 589 S.W.2d 494 (Tex.App.1979). The Maryland court in *General Motors Ac-*

---

**13.** It appears that one of the frequent UCC claims is not to alter the substantive meaning of the contract, but to impose the UCC warranties of fitness like those contained in W.Va.Code, 46–2–314 and –315. *See Meeker v. Hamilton Grain Elevator Co.*, 110 Ill.App.3d 668, 66 Ill. Dec. 360, 442 N.E.2d 921 (1982); *Anderson Constr. Co. v. Lyon Metal Prods., Inc.*, 370 So.2d 935 (Miss.1979); *Jandreau v. Sheesley Plumbing & Heating Co., Inc.*, 324 N.W.2d 266 (S.D.1982). Independent of the UCC, we have recognized that it is implicit in a building contract that the work will be done in a workmanlike manner

and that the structure will be reasonably fit for its intended use. *See Gamble v. Main*, 171 W.Va. 469, 300 S.E.2d 110 (1983). Moreover, we have held that there is strict liability in tort for a defective product which causes injury. *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979). This may extend to the loss of the product itself. *Capitol Fuels, Inc. v. Clark Equip. Co.*, 181 W.Va. 258, 382 S.E.2d 311 (1989). Thus, the need to bring these UCC remedies into play in a building contract is not critical.

*ceptance Corp.*, 303 Md. at 259–60, 492 A.2d at 1309, made this statement with which we agree:

"With respect to notice of default, the surety is ordinarily held to know every default of his principal because he is under a duty to make inquiry and ascertain whether the principal obligor is discharging the obligation resting on him. *See* L. Simpson, [*Handbook on the Law of Suretyship*] § 41, at 165 [ (1950) ]."

For these reasons, it was error to grant a directed verdict to USF & G on the notice question.

Accordingly, we reverse and remand the case for further proceedings consistent with this opinion.

Reversed and remanded.