## MID–STATE SURETY CORPORATION, Plaintiff

v.

## THRASHER ENGINEERING, INC., Defendant.

Mid–State Surety Corporation, Plaintiff

v.

## Diversified Enterprise, Inc. and International Fidelity Insurance Company, Defendants.

Civil Action No. 2:04–0813.

United States District Court, S.D. West Virginia, at Charleston.

June 3, 2008.

Apryll H. Boggs, R. Scott Long, Kathy A. Brown, Hendrickson & Long, Charles-

ton, WV, Scott D. Cessar, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, W. Thomas Ward, Ward & Associates, Williamson, WV, for Plaintiff.

John H. Tinney, John H. Tinney, Jr., Margaret M. Singleton, Meridith A. Osborne, The Tinney Law Firm, Carl L. Fletcher, Jr., Gene W. Bailey, II, Norman T. Daniels, Jr., Daniels Law Firm, Courtney Anne Kirtley, Edward D. McDevitt, Bowles Rice McDavid Graff & Love, Charleston, WV, Robert Dunlap, Beckley, WV, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOHN T. COPENHAVER, JR., District Judge.

Pending is the motion for partial summary judgment of Mid–State Surety Corporation ("Mid–State"), filed February 6, 2006. Also pending is the motion for partial summary judgment of International Fidelity Insurance Company ("Fidelity"), initially filed April 3, 2006, as a memorandum in opposition to Mid–State's motion for partial summary judgment, and recharacterized as a motion for summary judgment by order entered September 5, 2007.[1]

### I. Background

#### A. Factual Background

In July 2000, the Mingo County Public Service District ("Mingo County") contracted with Holley Brothers Construction Company ("Holley") for the construction of a water treatment plant. (Def.'s Mem. Opp'n Mot. 2–3). Mid–State issued a performance bond on behalf of Holley for the construction. (*Id.* 3). Around March 2002, Mingo County declared Holley to be in default and terminated Holley for cause. (*Id.*). Thereafter, Mid–State solicited bids for completion of the construction as required by the performance bond. (*Id.*).

On August 5, 2002, Mid–State entered into a written completion agreement ("Completion Agreement") with Diversified Enterprise, Inc. ("Diversified") under which Diversified agreed to "perform all of the work and other responsibilities of Holley under and by virtue of the terms of the Contract, just as though Contractor [Diversified] had been the contractor under The Contract in the first instance...." (Completion Agreement ¶ 2). Diversified further agreed to:

indemnify and save harmless Surety [Mid–State] from and against all liability, damages, loss, costs and expenses which Surety may sustain or incur in consequence of any act, omission or default of Contractor [Diversified] in the performance of the work under The Contract and this [Completion] AGREEMENT which gives rise to a claim against Surety.

(*Id.* ¶ 7). Mid–State required Diversified to obtain a performance bond for its work and name Mid–State as the owner. (*Id.* ¶ 9). On July 24, 2002, Fidelity issued an American Institute of Architects Document A312, December 1984 edition performance bond ("Performance Bond") for Diversified's work under the Completion Agreement, naming Diversified as principal and Mid–State as owner. (Def.'s Mem. Opp'n Mot. 3).

Diversified commenced construction on August 3, 2002. (Pl.'s Brief Supp. Mot. 3). Throughout the course of the construction, Fidelity sent Mid–State several "General Form Status Inquiries," which are form

---

1. On November 1, 2007, Fidelity requested oral argument on the pending motions for summary judgment. The court concludes that a hearing is unnecessary. The facts and legal contentions are adequately presented in the materials before the court and argument would not aid in the decisional process.

documents used by Fidelity to ascertain the progress of the construction. These forms state "[w]ithout prejudicing your right or affecting our liability under our bond . . ., we would appreciate such of the following information as is now available." (General Form Status Inquiry). It then poses a number of questions and provides blank spaces for the bond owner to answer. (*Id.*). In January 2003, Mid–State notified Fidelity, by completing a "General Form Status Inquiry," that the approximate date for completion was April 2003. (Def.'s Mem. Opp'n Mot. 3).

By February or March of 2003, the plant was sufficiently completed for Mingo County to take possession and make water. (*Id.* 4; Def.'s Mem. Opp'n Mot. 3). On January 12, 2004, Mid–State responded to another "General Form Status Inquiry," notifying Fidelity that the project was complete in April 2003, that the acceptance of Diversified's work was "in dispute," that the " 'percentage . . . of contract completed' was 100%," that there were unpaid bills for labor or materials, and that Mingo County would not pay out the retainages. (General Form Status Inquiry; Def.'s Mem. Opp'n Mot. 4).

Despite the fact that Mingo County was in possession of the plant and making water, Mingo County contended that there was still substantial work to be completed by Diversified under the contract. (Pl.'s Brief Supp. Mot. 4). Thus, Mingo County instituted an action on August 13, 2004 in state court against Mid–State and Diversified, *Mingo County Public Service District v. Mid–State Surety Corp. & Diversified Enterprise, Inc.,* Civil Action No. 04–C–273 (Circuit Court of Wyoming County).

Four days later, on August 17, 2004, Mingo County's engineer certified Diversified's work as substantially complete. (Certificate of Substantial Completion). According to the Certificate of Substantial Completion, the date of substantial completion "is the date on which the construction is sufficiently completed in accordance with the contract documents that the project or a specified part of the project can be utilized for the purpose for which it was intended." (*Id.*). It is also "the date on which the Owner accepts the system and assumes full responsibility for operation and maintenance." (*Id.*). The Certificate of Substantial Completion also incorporates a list of items remaining to be completed or corrected by the contractor and provides that the list is not exhaustive and "does not alter the responsibility of the Contractor to complete all work in accordance with the contract documents." (*Id.*). Diversified did not complete the list associated with the Certificate of Substantial Completion and thus never achieved final completion. (Shutt Aff. ¶ 4). The terms of the construction contract, incorporated by reference into the Completion Agreement, give the date of substantial completion further significance, providing, "[t]he CONTRACTOR shall guarantee all materials and equipment furnished and WORK performed for a period of one (1) year from the date of SUBSTANTIAL COMPLETION. . . . The Performance BOND shall remain in full force and effect through the guarantee period." (Construction Contract GC–21).

From December 10, 2004 to early 2005, Mingo County, Diversified, and Mid–State attempted to mediate Mingo County's state court action, but Diversified refused to contribute to any settlement. (Pl.'s Brief Supp. Mot. 5). Based upon Diversified's unwillingness to contribute to the settlement with Mingo County, Mid–State sent Fidelity a letter on January 10, 2005, stating that Mid–State was considering declaring Diversified in default and requesting a conference. (Letter, Jan. 10, 2005). This letter expressly stated that it was

being sent pursuant to the formal notice requirements of the Performance Bond which, it is noted, provided for a conference. (*Id.*). Fidelity responded on February 4, 2005, advising Mid–State that it had referred the matter to Diversified and stating that Fidelity anticipated that Mid–State and Diversified would work together to resolve their problems. (Letter, Feb. 4, 2005). Fidelity's letter also informed Mid–State that unless Fidelity heard otherwise, it would assume that all outstanding issues were resolved between Diversified and Mid–State. (*Id.*). No conference was ever conducted in response to the January 10, 2005 letter. (Def.'s Mem. Opp'n Mot. 12).

Because Diversified continued to refuse to contribute to any settlement in Mingo County's state court action, Mid–State instituted the present action in federal court on January 26, 2005, against Diversified alleging breach of the completion agreement and seeking indemnity thereunder. (Pl.'s Brief Supp. Mot. 5; Def.'s Mem. Opp'n Mot. 6). Two days later, Mid–State and Mingo County finalized a settlement agreement and release in Mingo County's state court action. (Pl.'s Brief Supp. Mot. 5; Def.'s Mem. Opp'n Mot. 6). On February 8, 2005, Mid–State sent Fidelity a letter declaring Diversified to be in default. (Letter, Feb. 8, 2005). Mid–State again cited to the notice requirements of the Performance Bond in its letter. (*Id.*). On the same day that this letter was mailed, Mid–State added Fidelity as a party to this action in federal court, which was filed initially against Diversified only. (Def.'s Mem. Opp'n Mot. 6). Fidelity contends that February 8, 2005 is also the day that it first learned of Mingo County's state court action against Mid–State and Diversified, which by then had been settled for eleven days. (*Id.* 5).

B.    Procedural Background

Mid–State's motion for partial summary judgment requests, among other things, that the court declare Fidelity liable for any judgment rendered against Diversified in this action. (Pl.'s Brief Supp. Mot. 22–23). Fidelity failed to file a timely response to Mid–State's motion due to a change in counsel. (Def.'s Mem. Opp'n Mot. 1). Once new counsel was in place, Fidelity filed a motion for leave to file an out of time reply to Mid–State's motion for summary judgment, followed by a memorandum in opposition to Mid–State's motion. (*Id.*). In this memorandum, Fidelity alleges that it has no obligation to perform under the Performance Bond inasmuch as Diversified did not default under the completion agreement, and further inasmuch as Mid–State failed to satisfy certain conditions precedent to Fidelity's obligations under the Performance Bond. (*Id.* 2).

Shortly after the parties concluded the briefing just noted, Mid–State and Diversified entered into an arbitration agreement and moved the court to stay the action pending conclusion of the arbitration. (Joint Mot. to Stay). Fidelity was not a party to the arbitration agreement but joined in the motion to stay the action. (*Id.*). On May 5, 2006 the court granted the motion and stayed Mid–State's action against Diversified and Fidelity pending arbitration of the claims between Mid–State and Diversified. (Order, May 5, 2006). Ruling on Mid–State's motion for partial summary judgment as it pertained to claims against Fidelity was deferred until completion of the arbitration. (*Id.*).

The arbitrator rendered his award on September 22, 2006, directing Diversified to pay Mid–State the sum of $191,241.47. (Mem. Op. & Order, Jan. 30, 2007). The fact of the award suggests both default and failure to complete on the part of Diversified. In accordance with the arbi-

trator's award, the court, on January 30, 2007, entered judgment in favor of Mid–State and against Diversified in an amount of $191,241.47 plus post-award interest at a rate of 10% per annum commencing October 22, 2006, until paid in full. (Judgment Order, Jan. 30, 2007).

On April 5, 2007, Mid–State moved the court to lift the stay granted on May 5, 2006, and issue a ruling on Mid–State's motion for partial summary judgment as to Fidelity's obligations under the bond. (Mem. Op. & Order, Sept. 5, 2007). The court (1) granted the motion to the extent it sought a lifting of the stay, (2) recharacterized Fidelity's memorandum in opposition to Mid–State's motion for partial summary judgment as a motion for summary judgment, (3) recharacterized Mid–State's supplemental reply as a response to Fidelity's motion, and (4) directed the parties to further brief the arguments made in the Fidelity motion and response thereto. (*Id.*).

## C.   The Contractual Language at Issue

As earlier noted, the Performance Bond at issue is the American Institute of Architects Document A312, December 1984 edition performance bond, which was issued by Fidelity as surety to Mid–State as owner and Diversified as principal. Under the terms of the Performance Bond, Diversified and Fidelity bind themselves, jointly and severally, to Mid–State for the performance of the Completion Agreement, which is incorporated by reference into the Performance Bond. (Performance Bond ¶ 1).

Fidelity's first contention, namely, that it has no obligation under the bond because Diversified did not default under the completion agreement, rests on an application of paragraph 2 of the Bond. Paragraph 2 provides that "[i]f the Contractor [Diversified] performs the Construction Contract, the Surety [Fidelity] and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1." (*Id.* ¶ 2). According to Fidelity, Diversified substantially completed the Completion Agreement by March 2003, and thus there has been no contractor default, which Fidelity contends is a condition precedent to its liability under the Performance Bond. (Def.'s Mem. Opp'n Mot. 10–11). The Performance Bond defines "contractor default" as a "[f]ailure of the contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract." (Performance Bond ¶ 12.3).

Fidelity's second contention, which is that it has no obligation under the Bond because Mid–State failed to satisfy certain conditions precedent to Fidelity's obligations thereunder, turns on an application of paragraph 3, which provides as follows:

3   If there is no Owner Default [by Mid–State], the Surety's obligation under this Bond shall arise after:

3.1   The Owner has notified the Contractor and the Surety ... that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety ... to discuss methods of performing the Construction Contract ...; and

3.2   The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract ...; and

3.3   The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

(*Id.* ¶ 3). According to Fidelity, Mid–State failed to satisfy each of the requirements of paragraph 3 of the Bond, which Fidelity contends are conditions precedent to its obligations under the Bond. (Def.'s Mem. Opp'n Mot. 11–17).

Fidelity's obligations under the Bond, if any, are listed in paragraph 4. In summary, paragraph 4 provides that "[w]hen the owner has satisfied the conditions of Paragraph 3," the Surety must either arrange for the contractor to complete the construction contract, undertake to complete the construction contract itself, obtain bids or negotiated proposals for the completion of the construction contract, or waive its right to do each of the aforementioned options and, instead, either tender payment to the owner or deny liability. (Performance Bond ¶ 4).

## II. Governing Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing—"that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant

satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed.R.Civ.P. 56(c); *id.* at 322–23, 106 S.Ct. 2548. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir.1991).

A court must neither resolve disputed facts nor weigh the evidence, *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir.1995), nor make determinations of credibility. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir.1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Inferences that are "drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

On the intersection of the standards for summary judgment and contract interpretation, our court of appeals has observed that the matter of "interpretation is a subject particularly suited for summary judgment. . . ." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir.1999). It

has also been observed repeatedly, however, that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact ... [and] summary judgment is inappropriate." *Sempione v. Provident Bank*, 75 F.3d 951, 959 (4th Cir.1996). Expanding upon this analysis, the court of appeals has observed:

> A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if "susceptible to two reasonable interpretations." *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (1965). The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.

*Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir.1993).

## III. Discussion

### A. Contractor Default and the Arbitrator's Decision

█ Fidelity has asserted that it has no obligation under the Performance Bond because Diversified substantially completed the Completion Agreement. (Def.'s Mem. Opp'n Mot. 10). The Performance Bond states "If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond...." (Performance Bond ¶ 2). Fidelity contends that inasmuch as the plant was operational and pumping water by March of 2003, Diversified cannot be found to have defaulted and Fidelity's obligation under the Performance Bond was therefore not invoked. (*Id.* 11). The fact that the owner was making use of the plant is not determinative where such use occurred prior to substantial completion. As earlier noted, the construction contract, which is incorporated by reference into the Completion Agreement and again into the Performance Bond, provides not only for the owner's use of the plant prior to substantial completion but also that "[t]he Performance BOND shall remain in full force and effect through the guarantee period," which commences on the date of substantial completion and runs for a period of one year. (Construction Contract GC–14, GC–21). The date of substantial completion was August 17, 2004, so the Performance Bond was in effect until August 17, 2005. This action against Fidelity, filed on February 8, 2005, was instituted within the period of time that the Performance Bond was in effect.

Moreover, as already observed, on September 22, 2006, the arbitrator rendered an award, directing Diversified to pay Mid–State the sum of $191,241.47. (Mem. Op. & Order, Jan. 30, 2007). Specifically, the arbitrator found in favor of Mid–State on its claims in the amount of $403,063.49 and in favor of Diversified on its claims in the amount of $237,142.08. (Pl.'s Petition to Confirm Arbitration Award, Exhibit A). In accordance with the arbitrator's award, the court, on January 30, 2007, entered judgment in favor of Mid–State and against Diversified. (Judgment Order, Jan. 30, 2007).

█ Assuming without deciding that default is a condition precedent to Fidelity's obligation under the Performance Bond, the court proceeds to the issue of whether, in light of the arbitrator's decision, there has been a default. The court

concludes that the arbitrator's decision is preclusive on this issue. Under West Virginia law, an arbitration award is final and binding upon a surety and will be given collateral estoppel effect when a performance bond contains an arbitration provision or incorporates one by reference. *Rashid v. Schenck Constr. Co., Inc.*, 190 W.Va. 363, 367, 438 S.E.2d 543, 547 (1993). Under these circumstances, the surety is considered to have agreed to arbitrate even where the surety does not actually participate in the arbitration. *Id.* In *Rashid*, the West Virginia Supreme Court of Appeals stated:

> Under the Federal Arbitration Act and federal case law, an arbitration agreement can be incorporated into a subcontract by reference in a general contract. *Id.* Likewise, an agreement to arbitrate, where it is part of a general contract, can be incorporated into a bond by reference to the general contract. In *Transamerica Premier Insurance Co. v. Collins & Co.*, 735 F.Supp. 1050 (N.D.Ga.1990), the federal district court held that a surety could be forced to arbitrate a dispute where the performance bond incorporated, by reference, an arbitration clause found in the subcontract in question. *Id.* at 1051. This method of incorporation promotes arbitration as a favored method of dispute resolution.

*Id.* at 547.

The construction contract, originally agreed to by Mingo County and Holley, and adopted by Diversified under the Completion Agreement, states in part:

> All claims, disputes, and other matters in question arising out of, or relating to, the CONTRACT DOCUMENTS or the breach thereof ... may be decided by arbitration if the parties mutually agree. Any agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in any court having jurisdiction thereof.

(Construction Contract GC–21). The Completion Agreement incorporates the construction contract by reference, and thus Diversified, under the terms of the Completion Agreement, was entitled to agree to have the claims against it submitted to arbitration. The Performance Bond, in turn, incorporates the Completion Agreement by reference. Thus, the Performance Bond also incorporates this arbitration provision, albeit in a circuitous manner.

Pursuant to the terms of the construction contract and the Completion Agreement, Mid–State and Diversified entered into an arbitration agreement and moved the court to stay the action pending conclusion of the arbitration. (Joint Mot. to Stay). Fidelity was not a party to the arbitration agreement but joined in the motion to stay the action, which was granted. (*Id.*). Based upon Fidelity's joinder in this motion, Fidelity was clearly aware both that the arbitration was taking place and that the issue of default by Diversified would be considered. Fidelity's knowledge that the resolution of this issue could affect its liability under the bond is evidenced by its memorandum in opposition, which was filed before the agreement to arbitrate and in which Fidelity argued that it had no obligation under the Performance Bond because Diversified substantially completed the Completion Agreement. Fidelity could have participated in the arbitration of this issue, but chose not to do so. Accordingly, the arbitrator's decision is preclusive on the issue of contractor default and will be enforced against Fidelity in this action.

**B. The Paragraph 3 Conditions Precedent**

▮ A performance bond is a contract and thus is subject to the general rules of

contract interpretation and construction. *L. Schreiber & Sons Co. v. Miller Supply Co.*, 77 W.Va. 236, 87 S.E. 353, 355 (1915). However, the doctrine of *strictissimi juris,* meaning strict construction, does not apply to a bond issued by a compensated surety inasmuch as such a surety is regarded in law as an insurer. *City of Mullens v. Davidson,* 133 W.Va. 557, 566, 57 S.E.2d 1, 7 (1949). "[A]s a bond executed by a surety for compensation is usually expressed in terms prescribed by the surety, it will for that reason be strictly construed in favor of the obligee." *Id.; see also Elkins Manor Assocs. v. Eleanor Concrete Works, Inc.,* 183 W.Va. 501, 508, 396 S.E.2d 463, 470 (1990).

Leading commentators in the area of construction law consider the A312 Performance Bond to be "one of the clearest, most definitive, and widely used type of traditional common law 'performance bonds' in private construction." Philip L. Bruner & Patrick J. O'Connor, Jr., 4 *Bruner & O'Connor Const. Law* § 12:16 (2007). The court agrees that the language of the A312 bond, the bond at issue here, is clear and unambiguous. Thus, its interpretation is a suitable subject for summary judgment.

■ The plain language of paragraph 3 of the Performance Bond provides for conditions precedent to Fidelity's liability under the Bond. Under West Virginia law, "no particular form of words is necessary in order to create an express condition." *Beattie–Firth, Inc. v. Colebank,* 143 W.Va. 740, 744, 105 S.E.2d 5, 8–9 (1958). Words such as "provided that" and "if," when used to qualify a promise, are among the most commonly used expressions to create a condition precedent, but they are not the only words capable of doing so. *See id.* (citing Restatement of Contracts § 258).

Thus, a condition precedent is more a matter of the intention of the parties than it is an issue of phrase or form. *Miners' & Merchants' Bank v. Gidley,* 150 W.Va. 229, 235, 144 S.E.2d 711, 715 (1965).

■ Paragraph 3 provides in pertinent part that "[i]f there is no Owner Default, the Surety's obligation under this Bond shall arise after . . . ." (Performance Bond ¶ 3). The parties clearly intended for Fidelity to serve as insurer for the completion of the construction of the water treatment plant. The purpose of including this paragraph within the Bond was to give Fidelity an opportunity to protect itself in the event of a default by Diversified, without denying Mid–State a means to obtain completion. Although the West Virginia Supreme Court of Appeals has not interpreted the language of the A312 bond, numerous other courts have done so and have come to the same conclusion to which this court comes today, namely, that the provisions of paragraph 3 create conditions precedent which must be satisfied by the owner, in this case Mid–State, before the surety has any obligation under the Bond. *See, e.g., Enterprise Capital, Inc. v. San–Gra Corp.,* 284 F.Supp.2d 166, 179–181 (D.Mass.2003); *Bank of Brewton, Inc. v. Int'l Fid. Ins. Co.,* 827 So.2d 747, 753 (Ala.2002).

■ If the terms of an express condition precedent are not satisfied, the duty to perform the conditioned promise does not arise. *Beattie–Firth,* 105 S.E.2d at 8–9. Thus the court, having found the requirements of paragraph 3 to be conditions precedent to Fidelity's obligations under the Bond, must also consider whether Mid–State satisfied each of these conditions and thus triggered Fidelity's obligations.

1. Paragraph 3.1—Notice and Conference

■ Paragraph 3.1 requires Mid–State to notify Diversified and Fidelity that

Mid–State is considering declaring default and to request and attempt to arrange for a conference. (Performance Bond ¶ 3.1). There is no question that Mid–State satisfied this requirement when it sent the letter, dated January 10, 2005, which stated that Mid–State was considering declaring Diversified in default. The letter to Fidelity, which was copied to Diversified, states in pertinent part "[p]lease understand this letter to be formal notice, pursuant to Article 3 of the above captioned Performance Bond, that Mid–State is considering declaring a contractor default and hereby requests a conference with your Principal and you." (Letter, Jan. 10, 2005). The letter plainly satisfies the requirements of paragraph 3.1 of the Performance Bond.

Fidelity contends, nonetheless, that Mid–State never intended to arrange for a conference as required by paragraph 3.1, and that Mid–State's ultimate failure to schedule such a conference belied its request therefor in the January 10, 2005, letter. (Def.'s Mem. Opp'n Mot. 11–13). Fidelity, however, reads a heavier burden into the Bond than the plain language of the Bond requires. Paragraph 3.1 simply requires Mid–State to *attempt[ ]* to arrange a conference with the Contractor and the Surety ... to discuss methods of performing the Construction Contract," which Mid–State did in its January 10, 2005, letter. (Performance Bond ¶ 3 (emphasis added)). It does not require Mid–State to actually hold such a conference. Moreover, nothing in the evidence suggests that Mid–State's attempt was made in bad faith.

2. Paragraph 3.2—Default and Termination

■ Paragraph 3.2 requires Mid–State to declare Diversified to be in default and to formally terminate Diversified's right to complete the contract. (Performance Bond ¶ 3.2). The purpose of including such a provision in a performance bond is generally "to avoid the common-law rule that a secondary obligor [such as Fidelity] is not entitled to notice when the time for its performance is due." *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 111 (5th Cir.1994); *see also Elkins Manor*, 396 S.E.2d at 470–71 (applying the common law rule where a performance bond did not expressly require notice). Mid–State satisfied the requirements of paragraph 3.2 with its February 8, 2005, letter which stated in full "[i]n follow-up to our letter of January 10, 2005, please understand this letter to be a notification under Article 3.2 of the captioned Performance Bond of a contractor default." (Letter, Feb. 8, 2005).

Inasmuch as Mid–State's February 8, 2005, letter declares the contractor's default and cites to paragraph 3.2 of the Performance Bond, it was sufficient to terminate Diversified's right to complete its work on the construction project and to provide Fidelity with notice of Diversified's default, even though the letter does not also expressly state that Diversified's rights have been "terminated." It is well settled that forfeiture on technical grounds is not favored and that courts should not apply the doctrine of *strictissimi juris* for the protection of a compensated surety. *Md. Casualty Co. v. Fowler*, 31 F.2d 881, 884 (4th Cir.1929). To find that Mid–State has sacrificed the benefit of a contract intended to insure the completion of the construction project simply because Mid–State failed to use the word "terminate" in its notice would be to find forfeiture on technical grounds. Moreover, even if the declaration of default was not sufficient to terminate Diversified's right to complete

the Completion Contract, Mid–State's civil action against Diversified in federal court, filed January 26, 2005, for breach of that contract and indemnification would be sufficient to terminate those rights.

3. Paragraph 3.3—Payment of the Balance

█ Finally, paragraph 3.3 requires Mid–State to agree to pay the balance of the contract price to Fidelity or to a contractor selected to perform the Completion Agreement. (Performance Bond ¶ 3.3). According to Mingo County and Mid–State, the final adjusted contract balance was $627,000. (Settlement Agreement ¶ 1). Mid–State settled with Mingo County in state court for $600,000 in exchange for a release of any claims against Mid–State and a release of Mid–State's obligations under the performance bond (under which Mid–State was surety to Holley), construction contract, and Completion Agreement. (*Id.* ¶ 2). Mid–State now contends that there was no contract balance due inasmuch as Mid–State sought recovery from Diversified of damages in excess of $600,000 and the arbitrator ultimately awarded Mid–State $191,241.47 in damages from Diversified. (Pl.'s Resp. 4). Since there was no balance to be paid to Fidelity on the Completion Agreement at the time of Diversified's breach, it was not possible for Mid–State to comply with paragraph 3.3 of the Performance Bond and it was excused from doing so. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 219 F.Supp.2d 403, 484 (S.D.N.Y.2002)(bond owner was not required to pay surety when there was no remaining contract balance at the time default was declared).

Based upon the foregoing, the court finds that Mid–State is entitled to summary judgment inasmuch as it has demonstrated that it has satisfied all of the conditions precedent to Fidelity's obligations under the Performance Bond.

C. An Alternate Theory

█ Even if Mid–State were unable to demonstrate that it complied with the conditions precedent—which it did—there is yet another ground upon which this court may grant Mid–State's motion for summary judgment. Mid–State is entitled to summary judgment based upon the indemnification provision contained in the Completion Agreement, which is incorporated by reference into the performance bond, and which is not encumbered by any conditions precedent. This conclusion is the same as that reached by the district court for the Southern District of New York in *International Fidelity Insurance Co. v. Rockland et al.*, 98 F.Supp.2d 400, 435 (S.D.N.Y.2000).

The plaintiff[2] in *Rockland*, like Mid–State, was a surety who had taken over the construction contract of its principal and hired a new contractor to complete the project. *Id.* at 403. One of the four defendants, Fidelity and Guarantee Insurance Co. ("Surety"), was the surety for the new contractor hired by the plaintiff. *Id.* The dispute between the plaintiff and the Surety was over the Surety's obligation to indemnify the plaintiff for damages caused by the contractor. *Id.* The performance bond at issue in *Rockland* was the American Institute of Architects A312 bond, and thus contained the same paragraph 3 conditions precedent that are at issue in this case. *Id.* at 432. However, in *Rockland*, the plaintiff conceded that it failed to satis-

---

**2.** The court notes that Fidelity was the prevailing plaintiff in *Rockland* and therein made the same argument on this issue that Mid–

State makes and Fidelity rejects in the present case.

fy those conditions precedent, and was thus unable to recover from the surety under paragraph 4 of the bond. *Id.* at 433.

Despite plaintiff's failure to satisfy the conditions precedent, the court nonetheless held that the Surety was obligated to indemnify the plaintiff. *Id.* at 437. The court explained that the Surety's obligation to indemnify the plaintiff derived not only from its bond, but also from the completion contract which was incorporated within the bond by reference and which contained a separate indemnification provision. *Id.* at 433. Thus, the court framed the question before it as:

> not only whether the words in ¶ 3 of the ... Bond are written in such a way that the ¶ 3 acts constitute a condition precedent at all, but whether, even if they do, they constitute a condition precedent to any and all obligations for which [the Surety] might be liable—including indemnification for delay claims brought by the County [the party for whom the construction was being performed] against [the plaintiff]—as opposed to simply a condition precedent to the acts listed in ¶ 4 of the ... Bond.

*Id.*

The court determined that the language of paragraph 3 did not create a condition precedent to the Surety's obligation to indemnify the plaintiff under the completion contract. *Id.* Applying New York law, the court began its discussion by noting the distinction between express and implied conditions. *Id.* at 434. Express conditions are those conditions "agreed to and imposed by the parties themselves," and must be literally performed. *Id.* Implied conditions, also called constructive conditions, are those "imposed by law to do justice," and require only substantial performance inasmuch as they ordinarily arise from language of promise. *Id.*

"In determining [under New York law] whether a particular agreement makes an event a condition[,] courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition." *Id.* The court further observed that the preference in general contract law against finding an express condition is "reinforced, in the interpretation of a *surety* contract, by the cases holding that the bond of a compensated surety is to be construed liberally in the interest of the beneficiary, and ambiguities are to be resolved in the beneficiary's favor." *Id.* Applying this standard, the court concluded that the introductory language of paragraph 3 did not contain "unmistakable" language creating a condition to obligations other than those listed in paragraph 4 of the bond, and thus the court was obligated to construe it as creating a promise rather than a condition. *Id.* at 435.

The court noted that construction of paragraphs 1 and 2 of the bond supported the conclusion that the Surety was obligated under the completion contract to indemnify the plaintiff. *Id.* at 435–36. In paragraph 1 the Surety bound itself, jointly and severally, with the contractor for the performance of the completion contract, and paragraph 2, "the defeasance clause," conditioned the release of the Surety and the contractor on the contractor's performance of the completion contract. *Id.* Because the contractor did not complete completion contract, the court concluded that the contractor and the Surety were not released of their obligations under the bond. *Id.* at 436. The court concluded, "in the absence of unmistakable language expressly conditioning [the Surety's] performance obligation upon the performance of additional acts by [the plaintiff, the Surety] remains bound for the performance of the Construction Contract, includ-

ing the obligation therein to indemnify [the plaintiff]." *Id.*

■ Were this issue to be raised before the West Virginia Supreme Court of Appeals, the court believes that the West Virginia court would come to the same conclusion under West Virginia law because West Virginia follows the same rules as those relied upon by the District Court for the Southern District of New York in reaching its conclusion. Like New York, West Virginia also recognizes both express and constructive conditions. *Compare Miners' & Merchants' Bank,* 144 S.E.2d at 715 (express conditions), *and Beattie–Firth,* 105 S.E.2d at 8–9 (express conditions), *with Carper v. United Fuel Gas Co.,* 78 W.Va. 433, 89 S.E. 12 (1916)(constructive or implied conditions), *abrogated in part on other grounds by Peerless Carbon Black Co. v. Gillespie,* 87 W.Va. 441, 105 S.E. 517 (1920). When West Virginia courts recognize an implied provision in a contract, they may interpret it as either a condition or a covenant, but must choose the least burdensome of the two where both would effectuate the intent of the parties. *Carper,* 89 S.E. at 16. The West Virginia Supreme Court has stated:

> Whether the words amount to a condition, or a limitation, or a covenant, may be matter of construction, depending on the contract. The intention of the party to the instrument, when clearly ascertained, is of controlling efficacy; though conditions and limitations are not readily to be raised by mere inference and argument.

*Id.* Furthermore, as earlier noted, West Virginia also follows the rule that performance bonds issued by compensated sureties must be strictly construed in favor of the obligee and against the compensated surety. *Elkins Manor Assocs.,* 396 S.E.2d at 470; *City of Mullens,* 57 S.E.2d at 7.

Like the completion contract at issue in *Rockland,* the Completion Agreement here contains an indemnification requirement, separate from the obligations listed in paragraph 4 of the Bond. It states in pertinent part:

> Contractor [Diversified] shall indemnify and save harmless Surety [Mid–State] from and against all liability, damages, loss and expenses which Surety may sustain or incur in consequence of any act, omission or default of Contractor in the performance of the work under The Contract and this AGREEMENT which gives rise to a claim against Surety.

(Completion Agreement ¶ 7). Although Fidelity was not a party to the Completion Agreement, the Performance Bond, to which Fidelity was a party, incorporates the terms of the Completion Agreement by reference using language identical to that at issue in *Rockland.* (Performance Bond ¶ 1). The Performance Bond states in pertinent part:

> The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

(Performance Bond ¶ 1). Here, as in *Rockland,* the surety's obligation to indemnify the bond owner derives not only from the Bond, but also from the Completion Agreement.

As noted by the court in *Rockland,* it is unclear whether the paragraph 3 requirements were intended to be conditions precedent to obligations not expressly described in the Performance Bond. Applying West Virginia law, the court must construe the language against Fidelity, as a compensated surety, and in a manner that best effectuates the intent of the parties. *See Elkins Manor Assocs.,* 396 S.E.2d at

470; *Carper*, 89 S.E. at 16. As earlier noted, the parties intended for the Performance Bond to insure the performance of the Completion Agreement. In order to effectuate this intent, the court finds, as did the New York district court, that paragraph 3 was not intended as a condition precedent to Fidelity's obligation to simply indemnify Mid–State for Diversified's breach of the Completion Agreement.

Fidelity makes two arguments concerning the application of the *Rockland* holding to this case, both of which the court finds to be without merit. First, Fidelity argues that *Rockland* has been overruled *sub silento* by *Braspetro Oil Services Co.*, which holds that the requirements of Paragraph 3 of the A312 bond are express conditions precedent. (Def.'s Surreply 3–4). Fidelity fails to observe that in *Braspetro* the issue was whether the bond owner could recover under ¶ 4 of the bond, whereas in *Rockland*, the court considered whether the paragraph 3 requirements were conditions to any and all obligations of the surety. Moreover, Fidelity ignores the citation in *Braspetro* wherein the court expressly distinguished *Rockland* in a parenthetical, stating, "paragraph 3 of AIA 312 form did not establish conditions precedent to surety's liability for indemnification where construction contract contained separate indemnification provision." *Braspetro Oil Servs. Co.*, 219 F.Supp.2d at 477; *vacated in part on other grounds by U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34 (2d Cir.2004)(affirming the district court's factual findings and legal rulings as to liability, and vacating and remanding only for recalculation of damages).

Next, Fidelity contends that the facts of *Rockland* are distinguishable from those present here. (Def.'s Surreply 5–6). Fidelity argues that in *Rockland* the Surety had adequate notice of the problems with the contractor and sufficient opportunity to protect itself by mitigating the damages, whereas here, Fidelity claims it had no notice of the problems with Diversified and no opportunity to protect itself or ameliorate its damages. (*Id.*). Specifically, Fidelity maintains that it relied upon the January 2004 "General Form Status Inquiry" that stated that the project was 100% complete and that it had no knowledge of Mingo County's state court action against Mid–State and Diversified, let alone that Mid–State had settled for $600,000. (*Id.* 6).

In *Rockland*, the court noted that a "critical element of the analysis" of whether the bond owner substantially performed was whether the surety "obtained the opportunity to protect itself for which it had provided in the undertaking." *Rockland*, 98 F.Supp.2d at 438. The court found that the plaintiff had given the surety adequate notice of the problems and that the Surety had chosen not to act. *Id.* It based this conclusion on the fact that the plaintiff sent the Surety several notices of its problems with the contractor and its consideration of declaring default and that the owner requested a meeting with the Surety. *Id.*

Likewise, Mid–State sent Fidelity notice that it was considering declaring default as soon as Mid–State realized that Diversified intended to breach the Completion Agreement by refusing to cooperate in the settlement negotiations. Mid–State sent its paragraph 3.1 notice on January 10, 2005 and requested a conference with Fidelity. Fidelity responded on February 4, 2005, referring the matter to Diversified. Mid–State then filed its action against Diversified on January 26, 2005. On February 8, 2005, Mid–State followed-up on its January 10, 2005 letter with a second letter declaring Diversified in default per paragraph 3.2, and Fidelity was added to the action

approximately one month after it received the paragraph 3.1 notice.

Upon receiving the paragraph 3.1 notice, Fidelity should have investigated the cause for which Mid–State sent the letter. Instead, it deferred to Diversified and remained in ignorance of Mingo County's cause of action against Diversified for the contract secured by the Performance Bond. As the court stated in *Rockland,* "A surety cannot 'rest supinely, close his eyes, and fail to seek important information,' and then seek to avoid liability under the guaranty by claiming he was not supplied with such information." *Rockland,* 98 F.Supp.2d at 407. This is precisely what Fidelity has done here.

Moreover, Fidelity's reliance on the January 2004 "General Form Status Inquiry" is not well taken. From the Inquiry, Fidelity selects Mid–State's statement that the " 'percentage ... of contract completed' was 100%," but overlooks the statements that the project was completed in April 2003 and that the acceptance of Diversified's work was "in dispute" as of the date of the Inquiry, which was over eight months after the project was allegedly completed. Furthermore, Fidelity ignores Mid–State's disclosure that there were unpaid bills for labor or materials as of the date of the inquiry and that Mingo County would not pay out the retainages. This "General Form Status Inquiry," which was sent approximately one year before Mid–State's action was filed on February 8, 2005, also should have put Fidelity on notice that it ought to investigate the status of the Completion Agreement covered by its Performance Bond.

Based upon these facts, Fidelity had adequate notice of the problems between Mid–State and Diversified and adequate time to mitigate its costs, but failed to do so. Accordingly, the court finds Fidelity's attempt to distinguish the *Rockland* facts to be unpersuasive. Mid–State is entitled to summary judgment based upon the separate indemnity provision contained in the Completion Agreement.

### IV. Conclusion

Based upon the foregoing, it is ORDERED that Mid–State's motion for summary judgment be, and it hereby is, granted, and that Fidelity's motion for summary judgment be, and it hereby is, denied. The court concludes that Fidelity is liable for the Judgment entered against Diversified in favor of Mid–State in this court on January 30, 2007.

Counsel for Mid–State and Fidelity are directed to appear for a status and scheduling conference at 1:30 p.m. on June 12, 2008.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.